

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-25-2005

# Korytnyuk v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-1537

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Korytnyuk v. Atty Gen USA" (2005). *2005 Decisions.* Paper 1530.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1530

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 03-1537

MYKHAILO STEPANOVICH KORYTNYUK,

Petitioner

v.

JOHN ASHCROFT, Attorney General
of the United States;
U.S. DEPARTMENT OF JUSTICE
IMMIGRATION AND NATURALIZATION
SERVICE,

Respondents

Case No: 03-4677

MYKHAILO STEPANOVICH KORYTNYUK,

Petitioner

v.

JOHN ASHCROFT, Attorney General of
the United States,

Respondent

————————————

On petition for review of a final order
of the Board of Immigration Appeals
File No. A73 174 928

————————————

Argued September 27, 2004

————————————

Before: RENDELL, FUENTES AND SMITH, *Circuit Judges*

(Filed:   January 25, 2005)

—————————————

OPINION OF THE COURT

—————————————

Counsel:      Lawrence H. Rudnick, Esq. (Argued)
              Steel, Rudnick & Ruben
              1608 Walnut Street, Ste. 1500
              Philadelphia, PA 19103
              *Attorney for Petitioner*

              Peter D. Keisler, Assistant Attorney General, Civil
              Division
              David V. Bernal, Assistant Director
              Barry J. Pettinato (Argued), Senior Litigation
Counsel

              U.S. Department of Justice
              Office of Immigration Litigation
              P.O. Box 878, Ben Franklin Station

2

Washington, DC 20044
*Attorneys for Respondent*

_____

SMITH, *Circuit Judge*.

This immigration case presents two questions of law: (1) whether we have jurisdiction over certain discretionary denials by the Bureau of Immigration Appeals of motions to remand under the transitional rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, and (2) the appropriate standard of review for questions of fact where the Bureau of Immigration Appeals ("BIA" or "Board") denies a motion to remand in an exercise of its discretionary authority. We conclude that we have jurisdiction over the type of denial the BIA exercised in this case, and that the appropriate standard of review for the fact cited in that denial is substantial evidence. Because the immigration judge lacked substantial evidence for his factual finding that Petitioner participated in criminal activities in the Ukraine, a finding on which the BIA solely rested its denial of Petitioner's motion to remand, we will vacate the BIA's denial as an abuse of discretion and remand this case for further explanation and development of the record.

## I.

### A.

Mykhaylo Korytnyuk is a native and citizen of the Ukraine who came to the United States on June 8, 1993 on a visitor's visa. Korytnyuk overstayed that visa, and on May 15, 1996, the Immigration and Naturalization Service (INS)[1] commenced deportation proceedings against him. At a hearing before an immigration judge, Korytnyuk through counsel admitted that he had overstayed his visa and was held to be deportable, but requested asylum and withholding of deportation. On January 16, 1998, an immigration judge held a hearing on Korytnyuk's application for asylum and withholding of deportation, denied both requests for relief, and required a final order of deportation to be entered against Korytnyuk. Korytnyuk appealed to the BIA the denial of his application for asylum and withholding of deportation ("direct appeal").

While his direct appeal was pending, Korytnyuk received an approved immigrant petition for alien worker.[2] With that

---

[1] The INS is now the Bureau of Citizenship and Immigration Services within the Department of Homeland Security. 6 U.S.C. § 271 (2004). Because the INS was still in existence at the time of Korytnyuk's deportation proceedings, this opinion utilizes the term INS.

[2] Under § 203(b)(3)(A)(i), (ii) of the Immigration and Nationality Act, a number of visas are set aside for aliens who

4

approval in hand, Korytnyuk filed a motion to remand to the immigration judge ("IJ") so he could apply for adjustment of status to that of a lawful permanent resident. In February 2003, in a one-page decision, the BIA "dismissed" Korytnyuk's direct appeal and denied his motion to remand. In response, Korytnyuk timely petitioned this Court for review of the BIA's denial of his motion to remand. Soon thereafter, Korytnyuk filed with the BIA a motion to reopen his claim and a motion to reconsider its denial of his motion to remand. In November 2003, the BIA at once denied both of these motions. Korytnyuk filed a timely petition seeking review of that denial.

On petition to this Court, Korytnyuk does not seek review of the BIA's denial of his direct appeal. Instead of asylum in the United States, he seeks an adjustment of his status. Specifically, he petitions for review of the BIA's denials of his motions (1) to remand and (2) to reopen or reconsider insofar as they pertain to his efforts to apply for adjustment of status.[3] Our focus narrows further still, however, as, stripped of his direct appeal, Korytnyuk's motions to reopen and reconsider do little more than restate his motion to remand; and the BIA's denial of his motions to reopen and reconsider simply refers back to its rationale for denying his motion to remand. Thus, we are left

---

qualify as "skilled" and "professional workers." 8 U.S.C. § 1153(b)(3)(A)(i), (ii).

[3]At Korytnyuk's request, we have consolidated our review of his petitions for review of each of these denials.

essentially with the BIA's denial of Korytnyuk's motion to remand.

## B.

Our factual focus is on the IJ's determination that Korytnyuk, in the words of the BIA, "participated in criminal activities," as that finding is the sole basis on which the BIA denied Korytnyuk's motion to remand. We examine here the proceedings conducted by the IJ, his oral decision, and his written "Oral Decision and Order" ("Decision").

### 1. Deportation Hearing

Korytnyuk testified that he was born in Rivno, Ukraine.[4]

---

[4]The deportation hearing began ominously. When Korytnyuk took the stand, the IJ stated that he would "be showing to the respondent Exhibit 3-A, his asylum application and I will have him sign it. Sir, showing to you [sic] what is supposed to be your asylum application." Korytnyuk affirmed upon the IJ's questioning that the document bore his signature.

The IJ then inquired, "Do you know what this application says?" Korytnyuk replied "I do not," to which the IJ responded: "Well, that's your fault, sir. You were told to be prepared for today's hearing. We're not here simply to have a conference sir. We're here to decide your asylum application. You were supposed to prepare for that purpose." The IJ continued: "Now, this is the asylum application that you gave to the Immigration Service in 1993. Do you know what it says? Yes or no?" Korytnyuk responded, "I know that." He then affirmed

everything in the application. The IJ stated that they would go off the record so Korytnyuk again could sign the application.

As soon as the proceedings went back on the record, the IJ exclaimed:

> No! Five minutes before. We're 15 minutes late getting started here today. He's supposed to be prepared. [To Korytnyuk] Do you wish to sign this asylum application, sir? Yes or no? All right. I don't want any more problems here with you, sir, over preliminaries or I'm going to make it very clear to you, sir, you will be back here every single day! You're supposed to be prepared today! The taxpayers are paying for you to have a hearing. All right. [To the interpreter] Let me have the thing back. [To Korytnyuk] No, there's nothing for you to say, sir! [To Korytnyuk's counsel] And I'm standing here for 45 minutes while he tells me he doesn't know any of these documents. He's supposed to be prepared for today's hearing. If he's not prepared, this is my policy from now on. Somebody comes in here, is not prepared the day of the hearing, I'm dismissing the application for lack of prosecution. I'm going to order him deported and I'm going to ask the Service to take him into custody, and then you'll make a motion to reopen and see to it that he's prepared. He's supposed to know what these documents are all about. He's supposed to have seen them. He['s] supposed to have gone over them. I

7

He joined the military as soon as he left high school and served near the Afghanistan border in an elite paratrooper unit.  After he finished his military tour, Korytnyuk worked as a fire truck driver at a government chemical company in Rovno, Ukraine.[5]  In 1992, Korytnyuk joined the *druzhinnik*, a division of the local police force, called the *Berkut*.[6]  In the *druzhinnik*, Korytnyuk was trained in police work, protecting small businesses, and the *druzhinnik*'s major responsibility, to provide security for "critical situations" in the area.  Korytnyuk testified that, as an example of a "critical situation," the *druzhinnik* secured unsafe portions of the town.  Each member of the force wore a uniform

> explained it to him.  He doesn't—he, he thinks he's going to—he doesn't want to do it because he's not going to—he's not going to trust me.

[5]Korytnyuk refers to "Rovno" as the town where he worked when he left the military, and "Rivno" as the town where he was born.

[6]Korytnyuk's job afforded him three days off each week. He explained that he had been playing sports on those days off, but was being criticized by those around him for not doing enough with his free time.  At that point, the IJ interrupted Korytnyuk, directing the following comment to Korytnyuk's counsel: "You might want to ask him a question, Mr. Otero, because he's just talking, but he's not saying anything of relevance here." Korytnyuk's counsel explained that he would allow Korytnyuk to finish, at which point Korytnyuk explained that he found a job as "security for local police or militia."

during normal working hours.

Korytnyuk testified that the *druzhinnik* performed emergency assignments after working hours. At first, he believed they were being called to investigate suspicious people causing problems in the area, but later it became clear that these persons were suspicious simply because they were Ukrainian nationalists who had been informed upon by members of the former Communist party.[7]

Korytnyuk testified that during these after-work assignments, the rest of the team would enter a house and lock the door behind them. He "felt something unusual was going on there." He began to get "news such as people get beaten. They kill people. They get, they get dead, either in their house or in, in the hospitals." Korytnyuk stated that on orders from the group commander he always acted as a lookout and remained outside. When asked whether he ever was a witness to any beatings, Korytnyuk responded, "I was not. They would execute in the inside and they'd be inside, yes. In sometimes, I had learned that those people had died in the houses or the hospitals."

Korytnyuk testified that he learned of the beatings and killings from family members of those who had been harmed by

---

[7]The Ukraine declared its independence from the Soviet Union in August 1991, a declaration ratified by popular referendum on December 1, 1991.

the *druzhinnik*, and at first he did not believe their reports. Once he began to ask questions and speak out against the after-work assignments, he no longer received such assignments. He left the *druzhinnik* in October 1992, after roughly six months of involvement.

In November 1992, members of the *druzhinnik* warned Korytnyuk that he would be killed if he did not return to the force. His assignments changed at his job as a fire truck driver, and he began to be punished. He testified that he was severely beaten by five or six members of the *druzhinnik*, incurring an arm injury and bruises all over his body, and was hospitalized. When he returned to work, he was beaten several more times before he eventually left the town. Most notably, in February 1993, a group of *druzhinnik* officers broke into a friend's apartment where Korytnyuk was staying, destroyed property, and beat him and his friend. The beating cracked Korytnyuk's ribs, and he was taken to the hospital.

Korytnyuk submitted at least one medical report to buttress his claim that he had been beaten. The IJ noted at the opening of the hearing that one medical report was in the record. In response, Korytnyuk's counsel asked whether two medical reports were in the record. The IJ responded, "Well, so what's the problem? Because I've already told you that I've marked Exhibit 3-F [a single medical report] into the record of evidence. So what's the problem?" Korytnyuk's counsel asked, "Are those the medical records, Your Honor? I'm sorry, I made a mistake." The IJ responded, "Yes, I told you it's from a

10

hospital." Later in the hearing, Korytnyuk's counsel returned to the subject: "The medical reports were already admitted without objection, correct[?]" The IJ responded, "[t]hat's correct. For the third time, it's correct, Mr. Otero!" Korytnyuk's counsel explained he understood. The IJ replied: "Are you here today . . . or not here today? . . . You questioned me. I told you at the beginning it was in the record of evidence. Then you asked me, is it in the record of evidence? Then I told you it is in the record of evidence. Let the record show now for the third time, I'm telling you that that medical report is in the evidence. Do you understand that?"

Korytnyuk testified that he reported his final beating to the police, but nothing was done. Before the beating, members of the *druzhinnik* had warned Korytnyuk that they were not "kidding with [him] anymore," but were ready to kill him. After the beating, Korytnyuk fled Rovno and hid elsewhere in Ukraine, but he did not feel safe within the country because *Berkut* was a national organization. Soon thereafter, Korytnyuk paid "big, big money" for a passport to leave the Ukraine.

On cross examination, government counsel questioned Korytnyuk about his emergency assignments with the *druzhinnik*. Korytnyuk affirmed that on such assignments those who went into houses wore ski masks, but he did not because he "was away in [his] vehicle." He acknowledged that he saw people come out of their houses beaten.

Counsel for the government asked Korytnyuk if he remembered telling an INS asylum officer that he had gone on

11

10 or 12 missions for the *druzhinnik*.[8] Korytnyuk responded that he did remember making that statement. Counsel then asked Korytnyuk whether he told the asylum officer that on "one of the missions in August, you actually put on a ski mask and participated in the beating of a businessman." After an unsuccessful hearsay objection to that question, the following colloquy, interrupted by the IJ, took place between Korytnyuk and government counsel:

> Korytnyuk: I think it was a mistake of my translator. He was not translating or interpreting correctly. I could not have said that no way.
>
> Counsel: And that you didn't go into this building with five others and beat this businessman to the point that he had to go to the hospital?
>
> Korytnyuk: I did not.
>
> Counsel: And that, and that afterwards, that after he went to the hospital, he would die. Isn't that correct, from the beating.
>
> Korytnyuk: That's correct. Many people had died in the hospital.

---

[8]The record contains no documents related to, or memorialization of, this interview.

12

IJ:        That's a very clever answer you gave, sir, and I want the record to show that's a very sophisticated answer because it avoids answering the question!  The question is, did you say that to the Immigration Service office?  Yes or no?

Korytnyuk:  Yes.

IJ:        You realize what you just said, sir?

Korytnyuk:  I do.

IJ:        Because you have denied that these were said.  It was all the interpreter's fault.  Now you said yes, you did tell the Immigration officer that you were present when people were beaten—when this man was beaten and taken to the hospital. You did tell that to the Immigration officer.  Is that correct, sir?

Korytnyuk:  I did.

IJ:        Continue, please.

Counsel:    And that you also told the Immigration officer that you had participated three other times in beating other people?

Korytnyuk:    I did say that.

When cross examination ended, the IJ asked Korytnyuk if he had been charged with a crime, and if so what crime. After stating that he had not committed any crimes, Korytnyuk acknowledged that he had been charged with violating "all Ukrainian's laws." The IJ again questioned Korytnyuk about the nature of the charge against him. Korytnyuk answered "[a]gainst Ukraine and I had, I had done like a propaganda politics against Ukraine and they try accuse me for what I was working there, literally." Apparently unsatisfied with this response, the IJ responded:

> Well, sir, let me tell you what I think they accused you of since you don't want to tell us. You were an enforcer, sir, for the mafia in Ukraine. That's why you were there when they were beating up businessmen and I wouldn't doubt that some of these enforcers were also in this police force and that's why they went out and did these things without a uniform. And then after a while, the police found out that you were involved as an enforcer for the mafia, sir. The honest police, not the corrupt ones that were doing this kind of work also and they charged you, sir, with assaulting people, with beating people up, maybe even with having been responsible for the death of people. Is that what you were charged with, sir?

When Korytnyuk answered in the negative, the Judge responded that there was no way to know what he was charged with because Korytnyuk had left the Ukraine. The IJ explained that

14

"it appears to me, sir, the reason why you left Ukraine was to avoid such a trial." Korytnyuk denied that assertion.

## 2. Explanation of "Oral Decision and Order"

After a recess, the IJ explained his forthcoming "Oral Decision and Order." He stated that he did not believe Korytnyuk's testimony, particularly regarding his "problem" with the *druzhinnik*. The IJ noted that the State Department's Country Reports on Human Rights Practices for 1992 did not mention that police organizations in the Ukraine committed the kind of crimes that Korytnyuk alleged the *druzhinnik* committed. The IJ explained that

> the evidence in my mind shows clearly that what happened here is that these so-called assignments that you went on were not authorized by the police in Ukraine. They were undertaking to extort money from innocent victims. They were crimes, and in my judgement [sic], sir, the reason why you were charged with a crime in Ukraine before you left that country was because the honest police in that country became aware of what was going on. . . . The fact that somebody doesn't want to go back to a country because they may be prosecuted for a crime there, does not entitle them to asylum.

The IJ stated that he had "other reports in here showing that Ukraine has taken tremendous strides in developing a democracy, sir." In light of Korytnyuk's "clearly . . . false

15

testimony," the IJ said he had denied Korytnyuk's request for voluntary departure and ordered him deported, explaining that "[t]his country cannot be allowed to become a haven, sir, for people who don't want to go to trial in their own country . . . ." The IJ added that he believed that Korytnyuk changed his story concerning his participation in the *druzhinnik*'s alleged beatings, first denying that participation until confronted with his former testimony to an INS asylum officer.

### 3. "Oral Decision and Order"

That same day, the IJ issued a written "Oral Decision and Order." The IJ stated that he had "no confidence in the veracity of the testimony offered by [Korytnyuk]" and explained that "[t]here is a 'smoking gun' to show that the respondent's testimony has been false." That smoking gun, according to the IJ, was the fact that the State Department's 1992 country conditions report reported "no political or other extra-judicial killing in Ukraine by the police or any other organization in that country during the year 1992." Further, the IJ stated that

> there are no reports that police organizations called *druzhinnik* or any other name were responsible for the kind of crimes that the respondent alleged occurred in 1992. This stark contrast between the respondent's testimony in Immigration Court under oath and the objective evidence regarding conditions in Ukraine is the prime factor indicating that this testimony is not reasonably worthy of belief. There is no plausible context for the claim made by respondent.

16

Next, the IJ stated that Korytnyuk contradicted himself during his testimony, first saying he was only a lookout, then stating that he knew what the *druzhinnik* was "doing to its victims." Additionally, according to the IJ, Korytnyuk's hearing testimony contradicted his earlier statement to an INS asylum officer that he had participated in beatings conducted by the *druzhinnik*. The IJ reasoned that Korytnyuk's

> attempt to make it appear that *druzhinnik* was acting under communist instructions to suppress Ukrainian nationalists is totally absurd. After August 1991, persons who espoused Ukrainian nationalism were free to state their views and participate in an independent government. The actions taken by *druzhinnik* were against businessmen that *druzhinnik* was extorting and not because of the political opinions of the victims. The fact that the respondent attempted to obscure this basic truth is another indication of the unreliability of his testimony.

The IJ found it "absurd" that Korytnyuk would have no personal knowledge of the *druzhinnik*'s crimes, and yet have so much information that the *druzhinnik* later tried to keep him from disclosing it.

Last, the IJ rejected Korytnyuk's claims that he did not know what he had been charged with in the Ukraine, and that he only learned of the charge after coming to the United States. The IJ determined that Korytnyuk was "aware before he departed from Ukraine that he had been charged with a crime,"

17

but that Korytnyuk was hiding the true nature of the charge. Moreover, the IJ concluded that "[t]he idea that [Korytnyuk] would have been charged with making 'propaganda' against the independent Ukrainian state strains credulity to the uttermost." The IJ concluded that the *druzhinnik* did not suppress Ukrainian nationalists, but instead extorted businessmen, such as a man who owned a news stand, whom Korytnyuk mentioned in an affidavit. "Plainly put," the IJ continued, "[Korytnyuk] was an 'enforcer' for organized crime elements that sought to victimize individuals who had tried to establish independent businesses in non-communist Ukraine." "Rather than face trial" for his offenses, the IJ concluded, Korytnyuk "took the opportunity to come to the United States" to avoid prosecution. The BIA adopted the IJ's finding that Korytnyuk, in the words of the BIA, "participated in criminal activities," and on that ground denied his motion to remand. We review that denial now.

## II.

The parties agree that this Court has jurisdiction over this case. Parties may not confer subject matter jurisdiction by agreement, however, and at first blush the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546, raises questions concerning our jurisdiction over Korytnyuk's appeal. It "is axiomatic that this court has a special obligation to satisfy itself of its own jurisdiction," *Urena-Tavarez v. Ashcroft*, 367 F.3d 154, 157 (3d Cir. 2004) (quoting *United States v. Touby*, 909 F.2d 759, 763 (3d Cir. 1990)), and so we begin by

18

considering whether the IIRIRA precludes our review of this dispute.

This case is governed by the transitional rules of the IIRIRA,[9] which generally provide judicial review of "final

---

[9] Section 309(c)(1) of the IIRIRA provides:

Subject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion or deportation proceedings before the title III-A effective date [April 1, 1997]--
> (A) the amendments made by this subtitle shall not apply, and
> (B) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments.

IIRIRA § 309(c)(1) (cited in *Stewart v. INS*, 181 F.3d 587, 592-93 n.4 (4th Cir. 1999)).

Section 309(c)(4) of the IIRIRA provides: "[i]n the case in which a final order of exclusion or deportation is entered more than 30 days after the date of the enactment of this act [September 30, 1996], notwithstanding any provision of section 106 of the Immigration and Nationality Act to the contrary[, the transitional rules apply.]." IIRIRA § 309(c)(4) (cited in *Stewart*, 181 F.3d at 593 n.4).

As Korytnyuk's deportation proceedings began on May 15, 1996 (before the title III-A effective date of April 1, 1997), and the final order of deportation was entered on January 27, 2003 (more than 30 days after enactment of the IIRIRA on

19

order[s] of exclusion or deportation." *See* IIRIRA Sec. 309(c)(1), (4) (codified at note to 8 U.S.C. § 1101 (2004)). Along with several sister circuits, we consider "final orders of deportation" to include a BIA order denying a motion to reopen. *See Sevoian v. Ashcroft*, 290 F.3d 166, 169 (3d Cir. 2002) (citing *Khourassany v. INS*, 208 F.3d 1096, 1100 (9th Cir. 2000)).[10]   As we explain below, *see* Sec. III, we treat Korytnyuk's motion to remand as a motion to reopen. Thus, if we have jurisdiction, we would consider the BIA's denial of his motion to remand as a final order of deportation.

The transitional rules that govern this case contain jurisdiction limiting provisions, however. As we have noted in an earlier decision, the theme of the IIRIRA can fairly be said to be "protecting the Executive's discretion from the courts." *Urena-Tavarez*, 367 F.3d at 158 (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486-87 (1999)). Among the jurisdiction limiting provisions of the transitional rules, § 309(c)(4)(E) provides that "there shall be no appeal of any discretionary decision under section 212(c), 212(h), 212(I), 244, or 245 of the Immigration and Nationality Act [sections 1182(c), 1182(h), 1182(I), 1254, or 1255 of this title] ["INA"]

---

September 30, 1996), the transitional rules apply to his appeal.

[10]*See also Stewart,* 181 F.3d at 593, citing, inter alia, *Sarmadi v. INS*, 121 F.3d 1319, 1321 (9th Cir. 1997), *Chow v. INS*, 1113 F.3d 659, 664 (7th Cir. 1997) (same); *Kalaw v. INS*, 133 F.3d 1147, 1150 n.4 (9th Cir. 1997).

(as in effect as of the date of the enactment of this Act)." IIRIRA § 309(c)(4)(E).

The immediate question for this Court, therefore, is whether the BIA's denial of Korytnyuk's motion to remand was a discretionary decision under one of the enumerated provisions of transitional rule § 309(c)(4)(E). We conclude that it was not.

In its entirety, the BIA's denial of Korytnyuk's motion to remand reads as follows:

> The respondent appeals from the [IJ's] denial of his applications for asylum and withholding of deportation. The respondent has also filed a motion to remand this matter so that he may apply for adjustment of status under section 245(a) of the [INA] as the beneficiary of an approved employment-based visa petition. The appeal will be dismissed, and the motion to remand will be denied.
>
> . . . .
>
> The [INS] has opposed the respondent's motion to remand. We agree that a remand for adjustment of status is not warranted as a matter of discretion in light of the determination that the respondent participated in criminal activities while a member of the special police unit, which was called the druzhinnik, for which he worked for six months in 1992 (I.J. at 16-19; Tr. at 65-68). Accordingly, the motion to remand will be denied. 8 C.F.R. § 3.2(c)(1), (4).

21

As a preliminary matter, we note that the denial does not purport to be a decision under § 245 or any other enumerated provision of § 309(c)(4)(E). The denial states that Korytnyuk filed a motion to remand "so that he may apply for adjustment of status" and concludes that "remand for adjustment of status" was not warranted. By its terms, the denial apparently precedes and is separate from an adjustment of status.

More importantly, the denial expressly relies on 8 C.F.R. § 3.2(c)(1), (4), not any of the enumerated provisions of § 309(c)(4)(E). There is no statutory basis for motions to remand under 8 C.F.R. § 3.2(c); the authority for such motions derives solely from the regulation, which is promulgated by the Attorney General. *See INS v. Doherty*, 502 U.S. 314, 321 (1992).[11] That regulation is not an enumerated provision in § 309(c)(4)(E) of the transitional rules. Thus, the decision of the BIA we are asked to review is not a judgment on whether to adjust Korytnyuk's status under § 245(a) of the INA, which would be a discretionary decision under an enumerated provision in § 309(c)(4)(E), but is rather a discretionary decision under a regulation not listed in, or derived from, any of the enumerated provisions in § 309(c)(4)(E). Therefore, we conclude that we have jurisdiction over this appeal under the transitional rules. *Cf. Luis v. INS*, 196 F.3d 36, 40 (1st Cir. 1999) ("This was a decision under 8 C.F.R. § 3.2(a), not one of those sections

---

[11] 8 C.F.R. § 3.2 is now codified at 8 C.F.R. § 1003.2.

22

enumerated in IIRIRA § 309(c)(4)(E) . . . .").[12]

---

[12]This conclusion accords with the Fourth Circuit's consideration of essentially the same issue in *Stewart*. That case held that § 309(c)(4)(E) "divests courts of jurisdiction only over BIA decisions that address the merits of an alien's request for relief pursuant to those sections" specifically enumerated therein. 181 F.3d at 595. To divest this Court of jurisdiction, *Stewart* would require that the BIA's decision be on the merits of Korytnyuk's request for an adjustment of status under § 245. Yet, in its denial the BIA mentioned none of the factors required to find an adjustment of status under § 245 (which in September 1996 included filing an application for adjustment, eligibility for an immigrant visa and admissibility for permanent residence, and immediate availability of an immigrant visa at the time an application is filed). *Id*. at 594. Instead, the BIA denied Korytnyuk's motion to remand for an adjustment of status in an exercise of its discretion under regulations not based in statute. Because the BIA's decision was not a merits denial of Korytnyuk's § 245 application, we have jurisdiction.

The First Circuit suggests that this result raises an important question of policy. That is, why "should review of a decision under INA § 245 not to grant an adjustment of status be precluded, while judicial review of the denial of a motion to [remand] to petition for adjustment of status is permitted?" *Prado v. Reno*, 198 F.3d 286, 291 (1st Cir. 1999). We agree with the First Circuit that this "small safety valve" of court review "ensures that the agency at least considers new information, even if its ultimately unreviewable judgment denies the relief sought." *Id*. "The space left open for judicial review

23

## III.

### A.

As noted above, for purposes of jurisdiction we treat a motion to remand as a motion to reopen. *See Bhiski v. Ashcroft*, 373 F.3d 363, 371 n.5 (3d Cir. 2004). We consider these devices as equivalent for jurisdictional and standard of review purposes because, as this case demonstrates and as the current regulations instruct,[13] motions to remand filed while an appeal is pending before the BIA are essentially motions to reopen denominated differently because no decision on the direct appeal exists to be reopened. Both devices require the proceedings to be reopened, however, and as such they are functionally identical. *See Rodriguez v. INS*, 841 F.2d 865, 867

---

is quite narrow," but Congress did leave the window "open a crack," *id.*, and it is not the province of the courts to close it.

[13]See 8 C.F.R. § 1003.2(c)(4) (2004):

> A motion to reopen a decision rendered by an Immigration Judge or Service officer that is pending when an appeal is filed, or that is filed while an appeal is pending before the Board, may be deemed a motion to remand for further proceedings before the Immigration Judge or the Service officer from whose decision the appeal was taken. Such motion may be consolidated with, and considered by the Board in connection with, the appeal to the Board.

24

(9th Cir. 1987) (citing C. Gordon & G. Gordon, 8 IMMIGRATION LAW AND PROCEDURE § 62.08[5], at 62-39 (1987)); *In re L-V-K-*, 22 I. & N. Dec. 976 (BIA 1999) ("A motion to reopen that is filed during the pendency of an appeal may be styled as a motion to remand. In substance, however, it remains a motion to reopen.") (citation omitted).[14] We thus find no reason to treat motions to remand differently from motions to reopen for purposes of determining whether we have jurisdiction, and determining the appropriate standard of review.

## B.

*Identifying* that standard of review is a more difficult proposition, however. To be sure, the Supreme Court and earlier panels of this Court have not left the field entirely open. *INS v. Abudu*, 485 U.S. 94, 104 (1988), lays down markers that

---

[14]*Cf. Doherty*, 502 U.S. at 329 (Scalia, J., concurring in the judgment in part and dissenting in part) ("[T]he nature of the INS regulations is such that the term 'reopening' also includes, to a large extent, what is in the judicial context the much more common phenomenon called 'remand for further proceedings.' Under the INS system, reopening is the sole means of raising certain issues that acquire legal relevance . . . only by virtue of the decision on appeal. A remand for that purpose often requires 'reopening' of the original hearing, and may be expressly denominated as such.").

guide our analysis[15]:

> There are at least three independent grounds on which the BIA may deny a motion to reopen. First, it may hold that the movant has not established a prima facie case for the underlying substantial relief sought. The standard of review of such a denial is not before us today, as we have explained. Second, the BIA may hold that the movant has not introduced previously unavailable, material evidence, 8 C.F.R. § 3.2 (1987), or, in an asylum application case, that the movant has not reasonably explained his failure to apply for asylum initially. . . . We decide today that the appropriate standard of review of such denials is abuse-of-discretion. Third, in cases in which the ultimate grant of relief is discretionary (asylum, suspension of deportation, and adjustment of status, but not withholding of deportation), the BIA may leap ahead, as it were, over the two threshold concerns (prima facie case and new evidence/reasonable explanation), and simply determine that even if they were met, the movant would not be entitled to the discretionary grant of relief. We have consistently held

---

[15]As noted above, we treat motions to remand as functionally equivalent to motions to reopen. It follows that in discussion of the appropriate standard of review of a motion to remand, we freely use cases discussing the standard of review of a motion to reopen. In quoting from such cases, the terms are to be understood interchangeably.

that denials on this third ground are subject to an abuse-of-discretion standard.[16]

Further, *Abudu* emphasized that determining the proper standard of review can depend on getting the case into the right one of the three listed categories. Each category is, as it were, hermetically sealed from the others. This seems to us the sole significance of the phrase "*independent* grounds" in the passage quoted above, and it is the plain implication of the description the *Abudu* Court gave of the Ninth Circuit's handling of the standard of review in that case:

> [T]he Court of Appeals in this case purported to decide 'whether [respondent] presented a *prima facie* case for reopening.' In so doing, the Court of Appeals set out a standard for BIA motions to reopen deportation proceedings that appears to have conflated the *quite separate issues whether the alien has presented a prima facie case for asylum with whether the alien has reasonably explained his failure to apply for asylum initially and has indeed offered previously unavailable, material evidence.* To the extent that the reasoning of the Court of Appeals addresses the issue of reopening rather than the issue of prima facie case for asylum, it is not supported by our cases . . . .

---

[16]*See also Sevoian*, 290 F.3d at 169-70 (citing *Abudu*, 485 U.S. at 105) (reiterating three categories).

27

*Id*. at 108 (emphasis added) (citations omitted).

Our threshold task is thus clear: we must determine on precisely what ground the BIA denied Korytnyuk's motion to remand. The result of that inquiry will determine the appropriate standard of review in this case.

Before commencing that effort, we note that this Court has filled a gap left in *Abudu*. As the first quotation above shows, the *Abudu* Court did not decide the appropriate standard of review of denial of a motion to reopen (or remand) where the petitioner failed to establish "a prima facie case for the underlying substantial relief sought." 485 U.S. at 104. We answered this question in *Sevoian*, holding that where the Board concludes that a petitioner has failed to establish a prima facie case for the underlying substantial relief sought, "the Board's findings of fact should be reviewed for substantial evidence, while its ultimate decision to reject [the petitioner's] motion to reopen should be reviewed for an abuse of discretion." 290 F.3d at 170.

We now determine on which, if any, of the three *Abudu* grounds the Board denied Korytnyuk's motion to remand. Taking *Abudu*'s first ground, there is no suggestion that the Board considered Korytnyuk's prima facie case for an adjustment of status. To the contrary, the Board's decision twice refers to consideration of his application for adjustment of status as a future event. In the opening paragraph, the decision states that Korytnyuk filed a motion to remand "so that he may apply for adjustment of status . . . ." In the paragraph

considering Korytnyuk's motion to remand, the decision states that "a remand for adjustment of status is not warranted . . . ." Moreover, nowhere does the decision mention any part of the substance of Korytnyuk's application for an adjustment of status, which Korytnyuk filed with his motion to remand, and which consisted mainly of his receipt of an approved labor certification and an approved immigrant petition. Finally, the sole reason offered by the Board for denying Korytnyuk's motion to remand – "the determination that the respondent participated in criminal activities" – appears wholly unrelated to his application for adjustment of status on grounds of receiving an approved labor certification and an approved immigrant petition. We thus conclude that the Board did not deny Korytnyuk's motion to remand on the ground that he had failed to make a prima facie case for adjustment of status.

Nor do we think the Board held that Korytnyuk had failed to introduce previously unavailable, material evidence. The plain text of the Board's decision compels this conclusion, as it does not mention any failure by Korytnyuk to introduce previously available, material evidence. Instead, we think that here, as "the ultimate grant of relief [was] discretionary," the Board "leap[ed] ahead, as it were, over the two threshold concerns . . . and simply determine[d] that even if they were met, the movant would not be entitled to the discretionary grant of relief." *Abudu*, 485 U.S. at 104. We base this conclusion on the Board's statement that "remand for adjustment of status is not warranted *as a matter of discretion* in light of the determination that the respondent participated in criminal

29

activities . . ." (emphasis added). By its terms, this seems to us a textbook "leap ahead" denial of a motion to remand.

We review the "leap ahead" denial of a motion to remand for abuse of discretion. *Abudu*, 485 U.S. at 105. *Abudu*, however, did not establish the standard of review for factual findings underlying a "leap ahead" denial of a motion to remand. As will be seen, we find most troubling in this case the IJ's factual determination, adopted by the BIA, that Korytnyuk participated in criminal activities. Thus, we must determine what standard to apply to the IJ's factual finding in this case. We conclude that factual findings underlying a "leap ahead" denial are reviewed for substantial evidence, and that the ultimate decision is reviewed for an abuse of discretion.

We base this conclusion on the language of the transitional rules, which control our review of this case.[17] Under the transitional rules, judicial review of exclusion and deportation orders must be conducted pursuant to 8 U.S.C. § 1105a(a) (repealed). *Mwongera v. INS*, 187 F.3d 323, 327 (3d Cir. 1999). Under that statute, which was in place when *Abudu* was decided, agency findings of fact are conclusive "if supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4) (West 1996). In other words, agency findings of fact are reviewed for what is known as "substantial evidence." The statute makes no distinction between standards of review of factual findings in

---

[17]*See* Section II, above.

some types of petitions for review versus others. All exclusion and deportation orders apparently are subject to review for substantial evidence, whether they appear as denials of direct appeals or, as here, denials of motions to remand. This conclusion accords with *Abudu*, as in that case the Court did not review a strictly factual finding by the BIA, but a mixed question of law and fact.[18]

Nor is this bifurcated approach novel under our jurisprudence. As we noted above, in *Sevoian*, we held that the bifurcated approach applied to a motion to reopen under *Abudu*'s first ground, i.e., whether there was a prima facie case for the substantive relief sought. 290 F.3d at 170. *See also Guo v. Ashcroft*, 386 F.3d 556, 561-62 (3d Cir. 2004) (reiterating bifurcated approach in petition for review of denial of motion to reopen under *Abudu*'s first ground). Upon careful consideration, we rejected the petitioner's argument that we apply de novo review to factual findings. We reasoned that

---

[18]Additionally, we do not believe *Abudu* established an abuse of discretion standard of review for purely factual findings because to have done so would have contradicted the language of the statute. With the judicial review statute that controls here, Congress evidently defined the jurisdiction of the federal courts of appeal to include certain findings of fact: those "supported by reasonable, substantial, and probative evidence on the record considered as a whole." As courts may not narrow congressionally prescribed jurisdictional boundaries, we decline to read *Abudu* to do so.

substantial evidence was the better standard because it applied to petitions for review of direct denials of asylum and was prescribed for review of final orders of removal under the IIRIRA, which applied to proceedings commenced after April 1, 1997. In contrast, we decided that the ultimate decision to deny reopening should be reviewed for abuse of discretion as some deference was appropriate for decisions made without the benefit of an evidentiary hearing. *Id.*

As in *Sevoian*, we face a question of first impression. We hold that where, as here, the ultimate grant of relief is discretionary and the BIA leaps ahead, as it were, over the two threshold concerns, and determines that even if they were met, the movant would not be entitled to the discretionary grant of relief, the Board's findings of facts should be reviewed for substantial evidence, while its ultimate decision to reject a motion to remand should be reviewed for abuse of discretion.[19]

---

[19]Our published decisions applying abuse of discretion review to denials of motions to reopen (or remand) under *Abudu*'s second and third grounds indirectly support the approach we adopt today. In no such case have we applied abuse of discretion review to the BIA's underlying factual determinations, for no such case has required us to review strictly factual determinations. *See Ezeagwuna v. Ashcroft*, 325 F.3d 396, 409-11 (evaluating mixed question of law and fact for abuse of discretion); *Lu v. Ashcroft*, 259 F.3d 127, 134-35 (3d Cir. 2001) (same). *See also Doherty*, 502 U.S. at 325-29 (evaluating mixed question of law and fact for abuse of

**IV.**

As the foregoing suggests, we will consider the merits of this petition for review in two steps. We first review for substantial evidence the factual finding underlying the BIA's denial of Korytnyuk's motion to remand. In light of the results of that review, we then will determine whether the BIA's ultimate decision denying Korytnyuk's motion to remand was an abuse of discretion.

**A.**

**1.**

We recently defined the contours of substantial evidence review in our *en banc* opinion in *Dia v. Ashcroft*, 353 F.3d 228, 247-48 (3d Cir. 2003) (paragraph breaks and parallel citations omitted), stating:

> We review the agency's findings of fact under the standard found in the [IIRIRA], which provides: "The administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Since the enactment of [the IIRIRA], various courts of appeals, including our court, have read this standard to require that the agency support its findings with substantial evidence, as articulated by the Supreme Court in *INS v.*

---

discretion); *Abudu*, 485 U.S. at 112 (same).

*Elias-Zacharias*, 502 U.S. 478, 481-84 (1992).  There, the Court framed the standard as follows:

> The BIA's determination that *Elias-Zacarias* was not eligible for asylum must be upheld if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'  8 U.S.C. § 1105a(a)(4).  It can be reversed only if the evidence presented by Elias-Zacharias was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed.  *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

*Id*. at 481.

We were careful in *Dia* to reiterate that the IIRIRA codifies the language that the Supreme Court used in *Elias-Zacarias* to describe the substantial evidence standard in immigration cases.  *Id*. at 248.  We underscore today that *Elias-Zacarias*, in turn, drew its definition of "substantial evidence" from the statute that controls our review of this case, 8 U.S.C. § 1105a(a)(4) (repealed).  *Id.* (quoting *Elias Zacarias*, 502 U.S. at 481).  We concluded:

> If the IJ's conclusion is not based on a specific, cogent reason, but, instead, is based on speculation, conjecture, or an otherwise unsupported personal opinion, we will not uphold it because it will not have

34

been supported by such relevant evidence as a reasonable mind would find adequate. In other words, it will not have been supported by substantial evidence.

*Id*. at 250.

**2.**

To begin, we "must clarify whether we review only the decision[] of the BIA or [that] of both the IJ and the BIA." *Abdulai v. Ashcroft*, 239 F.3d 542, 548 (3d Cir. 2001). As "Congress has granted us power to review only final orders of removal, and because the BIA has the power to conduct a de novo review of IJ decisions, there is no 'final order' until the BIA acts." *Id*. at 549 (citation omitted); IIRIRA § 309(c)(1), (4) (codified at note to 8 U.S.C. § 1101). However, while "the 'final order' we review is that of the BIA . . . [t]here are some situations in which a court of appeals effectively reviews an IJ's decision . . . ." *Id*. at 549, 549 n.2. For example, where the BIA "simply state[s] that it affirms the IJ's decision for the reasons set forth in that decision . . . the IJ's opinion effectively becomes the BIA's, and, accordingly, a court must review the IJ's decision." *Id*. at 549 n.2.

Here, the BIA's denial states: "The [INS] has opposed the respondent's motion to remand. We agree that a remand for adjustment of status is not warranted as a matter of discretion in light of *the determination* that the respondent participated in criminal activities while [in the Ukraine]" (emphasis added). The clear meaning of this statement is that the BIA adopted the

35

determination of the IJ that Korytnyuk participated in criminal activities. There is no evidence that the BIA conducted a de novo review of the record in this case. The sentence just quoted is the BIA's sole statement of justification for its denial of Korytnyuk's motion to remand. Moreover, the statement offers no pronoun denoting who made the determination. That is, the statement does not say, "remand . . . is not warranted in light of *our* determination," but that "remand . . . is not warranted in light of *the* determination . . . ." We have no doubt that the BIA deferred to the IJ's finding. As the IJ's opinion concerning Korytnyuk's participation in criminal activities effectively has become the BIA's, we must review the IJ's decision. *See id.* at 549.

Because the IJ's factual determination that Korytnyuk participated in criminal activities in the Ukraine was the sole reason that the BIA denied Korytnyuk's motion to remand, that is the only factual determination we review. *See Dia*, 353 F.3d at 245. Having summarized above the relevant portions of Korytnyuk's testimony before the IJ, *see* Section I. B. 1., we now consider whether the IJ's determination, adopted by the BIA, was supported by substantial evidence. *See id.* at 250-51. Where relevant, we supplement our analysis with details from the record, which we consider as a whole. 8 U.S.C. § 1105a(a)(4) (repealed); *Dia*, 353 F.3d at 248.

"Doing so, we find that the IJ's conclusions do not flow in a reasoned way from the evidence of record and are, at times, arbitrary and conjectural in nature." *Dia*, 353 F.3d at 250.

Instead, we conclude that the IJ based his determination that Korytnyuk participated in criminal activities on an adverse credibility determination that itself lacked substantial evidence. Accordingly, we will remand to the BIA to further explain and supplement the record on this issue. *See id*. at 260-61. With that accomplished, the BIA can determine whether Korytnyuk's application for adjustment of status should be considered.[20]

---

[20]As we discuss at note 22 below, in addition to contending that the IJ's decision lacked substantial evidence, Korytnyuk also claims the IJ's conduct violated his due process rights. *See* Pet. Br. at 27 ("Throughout the hearing, [the] IJ unfairly reprimanded both Mr. Korytnyuk and Mr. Korytnyuk's attorney, demonstrating anger towards them and a predisposition towards denial of the case, thus[] not permitting Mr. Korytnyuk to be heard in a meaningful manner and violating his right to due process."). The government contends that Korytnyuk waived this argument by not raising it earlier in any forum. Korytnyuk replies that he effectively preserved the issue under *Abdulrahman v. Ashcroft*, 330 F.3d 587, 595 n.5 (3d Cir. 2003). We will not reach this question, as we ultimately remand to the BIA for an abuse of discretion.

We do find such exchanges troubling, however. *See* note 4, above. Indeed, while we "recognize that assignment of an [IJ] is within the province of the Attorney General," if on remand an IJ's services are needed, we believe "the parties would be far better served by the assignment to those proceedings of a different IJ." *Paramasamy v. Ashcroft*, 295 F.3d 1047, 1055 n.4 (9th Cir. 2002) (quoting *Garrovillas v. INS*, 156 F.3d 1010, 1016 n.4 (9th Cir. 1998) (remanding order based

The IJ's conclusion that Korytnyuk participated in criminal activities is a direct product of his finding that Korytnyuk's overall testimony was not credible. *See* IJ's Dec. at 12-17. We think the record suggests, at the very least, that Korytnyuk's credibility requires further investigation. *See Dia*, 353 F.3d at 251.

*First*, the IJ's Decision identifies a "smoking gun" that purportedly proves that Korytnyuk gave false testimony:

> [Korytnyuk] alleged that *druzhinnik*, a police auxiliary organization, engaged in crimes in 1992 such as the

---

on adverse credibility finding for lack of substantial evidence in part because of apparent IJ bias)). Further,

> on remand, if the BIA concludes that [Korytnyuk's] testimony is not credible, it must articulate with specificity any inconsistencies or evasions it finds in his testimony, must address in a reasoned manner the explanations that [Korytnyuk] offers for the perceived inconsistencies or evasions, and must take expressly into consideration the extreme hostility the IJ exhibited toward [Korytnyuk] throughout the hearing, commencing at its very inception, as well as the inevitable effect upon an individual seeking asylum of an interrogation conducted in so intimidating a manner by a government official supposed to be a neutral arbiter.

*Garrovillas*, 156 F.3d at 1016.

38

following[:] [k]illing of 'pioneers' in the Ukrainian independence movement; [b]eatings of such individuals, or persons who owned businesses[;] [and] [e]xecutions of individuals who had supported Ukrainian independence. This assertion is manifestly untrue. . . . [T]here are no reports that police organizations called *druzhinnik* or any other name were responsible for the kind of crimes that the respondent alleged occurred in 1992. This stark contrast between [Korytnyuk's] testimony in Immigration Court under oath and the objective evidence regarding conditions in Ukraine is the prime factor indicating that his testimony is not worthy of belief. There is no plausible context for the claim made by the respondent.

But there was a plausible context for that claim. The 1992 State Department Country Report on Human Rights ("Country Report"), on the same page quoted by the IJ, states: "Torture is prohibited by Ukrainian constitutional law. Police beatings occasionally have been reported. During student demonstrations in front of the Parliament building in October 1992, police reportedly beat several students and a foreign reporter severely." Country Report at 951-52. We are mystified as to how the IJ could refer to the page containing this passage as a "smoking gun" and the "prime factor" showing that Korytnyuk gave false testimony. We think it supports the opposite conclusion. Korytnyuk alleged that he was part of a

39

police organization that beat political dissidents in their homes during off-hours. The Country Report states that "[p]olice beatings . . . have been reported." We see only accord between these two statements. The IJ is correct that the Country Report does not mention the *druzhinnik* by name, but that proves nothing. By its terms, the quotation is general in nature and any reasonable adjudicator would have taken it as such.

Moreover, the Country Report goes on to cite a specific, public beating by police of political dissidents in front of the Parliament building. Here again, we fail to see how this anecdote does anything but support Korytnyuk's testimony. To say, as the IJ implicitly must (for, again, he cites this very passage), that the facts differ between Korytnyuk's testimony about the *druzhinnik* beatings (done privately, during off-hours) and this citation (done publicly, presumably during hours when demonstrations would garner the most attention), is to miss the point. That is, if Ukrainian police felt free in October 1992 to beat political protesters in front of the Parliament building, it follows *a fortiori* that Korytnyuk's testimony of police beatings of political dissidents in the privacy of their homes during the same time period[21] has *at least* a "plausible context." As any reasonable factfinder would be compelled to conclude as much, the IJ's finding to the contrary lacks substantial evidence. *See Gao v. Ashcroft*, 299 F.3d 266, 278-79 (3d Cir. 2002) (citing

---

[21]Korytnyuk testified that he worked for the *druzhinnik* during October 1992.

State Department Report as undermining finding of substantial evidence for IJ's conclusions regarding foreign toleration of dissident movement).

*Second*, having established the lack of substantial evidence for the "prime factor" the IJ used to conclude that Korytnyuk lacked credibility, we consider alleged internal and external contradictions in Korytnyuk's testimony that the IJ finds undercut Korytnyuk's credibility. We focus primarily upon Korytnyuk's response of, "I did say that," to the question whether he told an INS asylum officer that he had participated three times in beating people. *See* Section III. B. 1, above. The record as a whole, however, prompts us to conclude that no reasonable adjudicator would have relied on this statement for the substantive proposition that Korytnyuk participated in criminal activities or to find that Korytnyuk lacked credibility.

We reach that conclusion chiefly because the statement was prompted by an interview with an asylum officer that is not in the record. Korytnyuk, in his briefs, complains that government counsel improperly failed to produce or submit for the record an "Assessment Referral Memo" that government counsel used in an effort to impeach Korytnyuk at his deportation hearing. Limited as we are to the record, we are not prepared to go that far. Nothing in the record suggests that Korytnyuk's interview with the asylum officer was memorialized – either in an "Assessment Referral Memorandum" or in any other form. We are thus left wholly guessing as to both the circumstances of this interview and what

41

was said in it.[22]  Yet, the IJ's Decision uses Korytnyuk's inculpatory testimony prompted by that interview not only to support his finding that Korytnyuk lacked credibility, but for the substantive proposition that Korytnyuk participated in the beatings alleged.[23]

We repeatedly have emphasized that we are "generally skeptical" of using reports of asylum interviews as the basis for finding an applicant lacks credibility where the context for such interviews is unclear.  For example, in *Dia*, we discounted the petitioner's interview with an airport immigration officer as probative of the petitioner's credibility in part because the

---

[22]Korytnyuk suggests that the IJ's reliance on this interview violated his due process rights because no writing produced from the interview is in the record.  The government responds that Korytnyuk waived this constitutional argument by failing to raise and argue it before the BIA.  We need not reach this issue because, as we discuss below, we conclude that reliance on the interview was impermissible under our cases interpreting the statutory, substantial evidence standard.

[23]"For the respondent to claim that the only knowledge that he had regarding *druzhinnik*'s crimes was what he heard from family members of victims was simply not correct.  As he admitted to the Service's Asylum Officer, and later, after being confronted *with this fact* in Immigration Court, the respondent had personal, first-hand knowledge of what *druzhinnik* did to its victims because he participated in those crimes himself on at least one occasion."  Dec. at 15 (emphasis added).

42

document memorializing the interview lacked an adequate foundation:

> We do not know how the interview was conducted or how the document was prepared. We do not know whether the questions and answers were recorded verbatim, summarized, or paraphrased. We cannot tell from the document the extent to which [the petitioner] had difficulty comprehending the questions, whether questions had to be repeated, or when and how sign language was used. Nor does the document reveal whether [the petitioner's] responses actually correspond to those recorded or whether the examiner recorded some distilled or summary version based on his best estimation of the response.

353 F.3d at 257 (quoting *Balasubramanrim v. INS*, 143 F.3d 157, 162 (3d Cir. 1998)). Similarly, in *Balasubramanrim*, we discounted the IJ's adverse credibility finding based on an airport interview in part because the hand written record of the interview lacked indicia of reliability. 143 F.3d at 162.

The context and contents of Korytnyuk's interview with an asylum officer are far more shrouded in doubt than the petitioners' in *Dia* and *Balasubramanrim*. To be sure, Korytnyuk's interview almost certainly was not any sort of airport interview, occurring as it allegedly did in 1996, three years after Korytnyuk came to the United States. And we acknowledge that, in *Dia*, we couched our concerns about asylum interviews lacking context in terms of the unusual

context of the airport, 353 F.3d at 257 ("we are generally skeptical of reliance on reports of airport interviews"), and that *Balasubramanrim* involved an airport interview. 143 F.3d at 162.

We think this apparent difference between Korytnyuk's case and the petitioners' in *Dia* and *Balasubramanrim* is beside the point, however. To begin, it obscures the fact that we do not *know* where Korytnyuk's interview with the asylum officer occurred. More critically, it ignores the fact that in both *Dia* and *Balasubramanrim* a writing existed. The passage quoted above from *Dia* and *Balasubramanrim* focuses on the dubious credibility of the documents memorializing the asylum interviews in those cases. Here, we have no document. Yet, the government asks us to ignore the lack of a writing and not only conclude that Korytnyuk's statement to the IJ supports the IJ's adverse credibility finding – a step we refused to take in *Dia* and *Balasubramanrim* with a writing in the record – but that his statement constitutes substantial evidence for the IJ's finding that Korytnyuk participated in criminal activities. In light of our precedents, we will do neither.[24]

---

[24]We also are troubled that Korytnyuk's statement to the IJ occurs soon after he raised concerns about the accuracy of the translator in relaying his conversation with the asylum officer, s*ee Qiu v. Ashcroft*, 329 F.3d 140, 155 (2d Cir. 2003) (concluding translator error contributed to BIA decision resting on factual determinations not supported by substantial evidence), and immediately following a highly confusing

44

Another alleged contradiction the IJ found in Korytnyuk's testimony concerned Korytnyuk's "attempt to make it appear that *druzhinnik* was acting under communist instructions to suppress Ukrainian nationalists," an attempt the IJ found "totally absurd." IJ's Dec. at 14. He continued: "After August 1991, persons who espoused Ukrainian nationalism were free to state their views and participate in an independent government. The actions taken by *druzhinnik* were against businessmen that *druzhinnik* was extorting and not because of the political opinions of the victims." *Id*. at 14-15. This was a "basic truth" that Korytnyuk tried to cover up, the IJ concluded. *Id*.

We are perplexed by the IJ's certainty here. We have already noted that the Country Report, on which the IJ relies, states that police beat student protesters in front of the Parliament building in 1992. That same Report notes that "[t]here is no Ukrainian law protecting freedom of speech and press. In August [of 1992] the President issued a warning that foreign critics of the Government (including journalists) could be deported within 24 hours." Country Report at 953. Both of these pieces of evidence tend to corroborate, rather than to undermine, Korytnyuk's testimony that the *druzhinnik* suppressed political speech.

Moreover, the IJ's assertion that the *druzhinnik* was extorting businessmen, rather than suppressing Ukrainian

question by the IJ. A.R. at 255-56.

nationalism, is patent speculation. In his affidavit, Korytnyuk claims that *druzhinnik* members "had beaten a leader of [a Ukrainian nationalist group] for disseminating information about the new Ukraine. . . . This man also owned a news stand which was burnt and his property destroyed." Aff. at 5. The IJ concluded that this news stand owner was being extorted by the *druzhinnik* for his money, *instead of* being persecuted for his speech.

But the record does not support this deduction. While Korytnyuk acknowledged his suspicions that the *druzhinnik* was connected to the mafia, and admitted that the *druzhinnik* was partially motivated by greed, he also alleged that the *druzhinnik* "did not believe in change or new ideas" and was motivated by intolerance. *Id*. Further, the Country Report notes that in 1992 "editions of independent periodicals were reported lost on route from printing presses to warehouses." Country Report at 953. Here again, the record seems to corroborate, rather than to undermine, Korytnyuk's testimony. Viewed in light of the record as a whole, the IJ's finding is nothing more than "unsupported personal opinion," *Dia*, 353 F.3d at 250, and lacks substantial evidence.

The IJ also finds contradictions in Korytyuk's testimony concerning his personal knowledge of what the *druzhinnik* did to its victims. "At one point," the IJ states, "[Korytnyuk] alleged that he was merely a 'lookout' who did not actually see what members of *druzhinnik* did to its victims. At other times, however, the respondent stated that he had knowledge of what

46

it was that *druzhinnik* was doing to its victims." But we think a reasonable adjudicator would reach the opposite conclusion. Korytnyuk stated on direct examination that he learned that the *druzhinnik* had beaten or injured people through conversations with victims' families. Later, on cross examination, Korytnyuk stated that he saw people who had been beaten coming out of their houses. We see no necessary contradiction between these two statements. Without an *a priori* commitment to Korytnyuk's lack of credibility – a commitment no reasonable adjudicator would have had – we fail to see how the IJ concluded Korytnyuk had contradicted himself by claiming to have learned of *druzhinnik*'s beatings through two independent means.[25]

---

[25]We are similarly untroubled by a related assertion by Korytnyuk that the IJ found "absurd." That is, Korytnyuk claimed that, on the one hand, he served as a mere "lookout" for the *druzhinnik* and had relatively little knowledge of its nefarious activities. On the other hand, he claimed that the *druzhinnik* sought to harm him because he knew too much. Here again, without having prejudged Korytnyuk's credibility, we fail to see how the IJ found these statements necessarily contradictory. Korytnyuk claimed, as a lookout, to have seen people emerging from their houses beaten. He also placed a hospital document in the record that describes Korytnyuk having cracked ribs in February of 1993, when he claimed to have been beaten by the *druzhinnik*. *See* Section IV. B., below. Both of these pieces of evidence support Korytnyuk's claim to have known enough about the *druzhinnik*'s activities to merit

Finally, the IJ makes much of the fact that Korytnyuk first refused to explain why he was charged with a crime in the Ukraine and then claimed he had "done propaganda against Ukraine." Given that the Ukraine had been independent from the Soviet Union for two years in 1993, the IJ found that "[t]he idea that [Korytnyuk] would have been charged with making 'propaganda' against the independent Ukrainian state strains credulity to the uttermost." IJ's Dec. at 16. We largely addressed this conclusion several paragraphs earlier, noting that it ignores the fact that there was no law protecting freedom of speech in the Ukraine in 1992. We pause here to note that the Country Report also states that a Ukrainian journalist was under investigation in 1992 for libel against the President for giving an interview critical of the Ukrainian Government. Country Report at 953. Further, we note that, though admitted only for identification, the document in the record stating Korytnyuk's criminal charge does not specify the nature of the charge. It thus could stand to reason that Korytnyuk did not know the nature of the charge, and only guessed that it involved propagandizing.

Yet, the IJ passed over parts of the record supporting Korytnyuk's explanation for the criminal charge in favor of the IJ's unsubstantiated, personal view: "Well, sir, let me tell [you]

---

recriminations for leaving the organization. In light of the record's consistency here, the IJ's finding that Korytnyuk lacked credibility concerning his knowledge of the *druzhinnik*'s activities lacks substantial evidence.

what I think they accused you of since you don't want to tell us. You were an enforcer, sir, for the mafia in Ukraine. That's why you were there when they were beating up businessmen and I wouldn't doubt that some of these enforcers were also in this police force . . . ." Such raw speculation does not amount to substantial evidence. In light of the Country Report, it is the IJ's conclusion, not Korytnyuk's testimony, that "strains credulity."

In sum, in the IJ's finding of adverse credibility "the inferences drawn and conclusions reached are in some instances non sequiturs, and in others, counterintuitive. The flow of the reasoning process appears to break down as the IJ, repeatedly, draws an unreasonable conclusion from a fact susceptible to differing interpretations." *Dia*, 353 F.3d at 251. As in *Dia*, we face "an aggregation of empty rationales that devolve into an unsupported finding of adverse credibility." *Id.* Moreover, here the IJ took a step beyond the IJ's findings in *Dia* and transformed an unsupported finding of adverse credibility into a positive finding that Korytnyuk participated in criminal activity. And the BIA relied on that latter finding alone to deny Korytnyuk's motion to remand.

We do not conclude that the IJ was bound to find that Korytnyuk was credible and lacked a criminal past. *Id.* "Rather, we recognize the possibility that the IJ's conclusions might ultimately be the correct ones. However, we cannot affirm the IJ's findings and conclusions on the record presented to us, as the reasons [he] does provide in support of [his] decision do not logically flow from the facts [he] considered." *Id.* We thus will

49

remand this case to the BIA to further develop and examine the record concerning Korytnyuk's credibility and alleged participation in criminal activities.

**B.**

**1.**

As noted above, we review the BIA's denial of a motion to remand for abuse of discretion, "mindful of the 'broad' deference that the Supreme Court would have us afford." *Ezeagwuna*, 325 F.3d at 409 (citing, inter alia, *Lu*, 259 F.3d at 131).[26] Under the abuse of discretion standard, we will not disturb INS decisions unless they are "'arbitrary, irrational, or

_____

[26]The phrase "broad deference" in cases involving BIA denials of motions to reopen (or remand) likely has its roots in *INS v. Rios-Pineda*, 471 U.S. 444, 449 (1985) (referring to the Attorney General's "broad *discretion*" over motions to reopen) (emphasis added). In that case, the Court considered whether the BIA exercised its discretion in "unreasoned or arbitrary" fashion, *id*. at 451, and whether the denial at issue "was grounded in legitimate concerns about the administration of immigration laws and was determined on the basis of the particular conduct of respondents." *Id*. at 451-52. "In this government of separated powers," the Court cautioned, "it is not for the judiciary to usurp Congress' grant of authority to the Attorney General by applying what approximates de novo appellate review." *Id*. at 452 (citing *INS v. Jong Ha Wang*, 450 U.S. 139, 144-45 (1981); *INS v. Phinpathya*, 464 U.S. 183, 195-96 (1984)).

contrary to law.'" *Sevoian*, 290 F.3d at 174 (citing *Tipu v. INS*, 20 F.3d 580, 582 (3d Cir. 1994)).[27]

**2.**

Acknowledging the "broad deference" we owe to the BIA, we conclude that the BIA abused its discretion in this case. First, as we have explained at length above, there was not substantial evidence for the BIA's sole stated basis for denying Korytnyuk's motion to remand – the IJ's factual finding that Korytnyuk "participated in criminal activities" in the Ukraine. We hold that it is an abuse of discretion to deny a motion to remand (or reopen) in an immigration case solely on the basis of

---

[27]The Supreme Court has explained the rationale for this highly deferential approach:

> Motions for reopening of immigration proceedings are disfavored for the same reasons as are petitions for rehearing and motions for a new trial on the basis of newly discovered evidence. *Abudu*, 485 U.S. at 107-108. This is especially true in a deportation proceeding, where, as a general matter, every delay works to the advantage of the deportable alien who merely wishes to remain in the United States. *See Rios-Pineda*, *supra*, 471 U.S. at 450.

*Doherty*, 502 U.S. at 325 (parallel citations omitted).

a factual finding that lacks substantial evidence, for to do so is necessarily arbitrary. *See id.* *Cf. Lu v. Ashcroft*, 259 F.3d at 134-35 (finding no abuse of discretion in adopting IJ's conclusions on mixed questions of law and fact sufficiently supported by the record); *Dia*, 353 F.3d at 260 n.29 (refusing to affirm IJ's decision on direct appeal where the IJ's troubling statements were not offset by otherwise appropriate credibility determinations and pertained to findings of fact crucial to the ultimate determination).

Second, we conclude that the Board abused its discretion in denying Korytnyuk's motion to remand because it failed to recognize that the IJ improperly treated Korytnyuk's proffer of medical records. In determining whether the BIA abused its discretion, we must ask whether the BIA "followed proper procedures and considered the material evidence before it." *Sevoian*, 290 F.3d at 177. We conclude that the IJ may never have seen material evidence that should have been before him. Though Korytnyuk does not directly raise the issue, we are troubled that the record in this case may be incomplete because the IJ silenced Korytnyuk's attorney when he tried to confirm that Korytnyuk's full medical records were in evidence.

As we record above, *see* Section I. B., Korytnyuk's attorney tried at least twice to ensure that the record contained all of Korytnyuk's medical records that Korytnyuk says support his claim to have been beaten by the *druzhinnik* for speaking out against its violence. Yet, both times, the IJ appeared to ignore the attorney's specific question – whether the record*s* were in

evidence – and instead responded with the assurance that "it" was in evidence. Indeed, the second time Korytnyuk's attorney raised the subject, the IJ rebuked him for raising a subject already covered. Additionally, in his Decision, the IJ never mentioned the single hospital record that was in evidence. We find this significant because if multiple records exist that show Korytnyuk was beaten, his credibility may be reinforced and, hence, his criminal background cast into doubt.

While the IJ "is not required to write an exegesis on every contention," he must show "that [he] has reviewed the record and grasped the movant's claims." *Sevoian*, 290 F.3d at 178. We conclude that the IJ here did not "grasp the movant's claims" because he potentially did not have all the material evidence before him. Accordingly, it was an abuse of discretion for the BIA to deny the motion to remand in reliance on the IJ's factual finding of Korytnyuk's participation in criminal activities because the BIA did not determine whether it had all material evidence before it. *Cf. Dia*, 353 F.3d at 254 ("[T]he IJ expressed a desire for corroboration . . . , then discouraged Dia from providing it, only to criticize and penalize Dia for not providing it. Such arbitrariness necessarily undermines the IJ's reasoning.").

## V.

For the foregoing reasons, we will vacate the BIA's denial of Korytnyuk's motion to remand, and remand this case to the BIA for further development and examination of the record concerning Korytynuk's credibility and alleged past

criminal activities in the Ukraine, and depending on its determination, consideration of Korytnyuk's adjustment of status application.