

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-27-2005

# Wang v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 04-2656

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Wang v. Atty Gen USA" (2005). *2005 Decisions.* Paper 1267.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1267

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-2656

———

NENG LONG WANG,

Petitioner

v.

ALBERTO GONZALES, Attorney General
of the United States;
MICHAEL CHERTOFF, SECRETARY OF DEPARTMENT
OF HOMELAND SECURITY,

Respondents

———

On Petition for Review of a decision and
order of the Board of Immigration Appeals
(BIA No. A77-935-836)

———

Argued March 7, 2005

BEFORE: SCIRICA, Chief Judge, and ROTH and
GREENBERG, Circuit Judges

(Filed:  April 27, 2005 )

———

Cherylle C. Corpuz (argued)
400 Market Street
Suite 450
Philadelphia, PA 19106

Joseph C. Hohenstein
NATIONALITIES SERVICE CENTER
1300 Spruce Street
Philadelphia, PA 19107

Attorneys for Petitioner

Peter D. Keisler
Assistant Attorney General
Civil Division
Emily Anne Radford
Assistant Director
Keith I. Bernstein (argued)
Attorney
Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044

Attorneys for Respondents

_____

OPINION OF THE COURT

_____

GREENBERG, Circuit Judge.

## I. FACTUAL AND PROCEDURAL HISTORY

This matter comes on before this court on a petition for review of a decision and order of the Board of Immigration Appeals ("BIA") dated May 11, 2004, denying petitioner Neng Long Wang ("Wang") asylum and withholding of removal and ordering his removal to China. We set forth the background of the case in some detail.[1]

Wang, who was born in China on October 1, 1985, is the older of two children. His sister was born in February 1988. Before his sister was born, Wang's parents worked and earned approximately 200-400 yuan per month. At that time the family lived in a house with a bathroom, living room, dining room and kitchen. Wang's

_____

[1] Inasmuch as the immigration judge found Wang to be credible, the BIA did not question Wang's credibility, and the government is not challenging Wang's credibility in these proceedings, we will state the facts according to his testimony during his administrative hearing at which he was the only witness.

2

parents lack formal education and do not speak Mandarin Chinese, the language apparently used in governmental matters.

Though China has a one-child per family policy to control the size of its population, Wang's parents were unaware of the policy until after his sister was born, an event leading the Chinese government to fine the family for having a second child. The local government authority sent a notice to Wang's parents informing them of the imposition of a 20,000 yuan fine against them (approximately $2,400.00 as of 2005 exchange rates; 100 times their lowest estimated monthly salary) by reason of the birth of their second child. Wang, however, does not claim that the government imposed the fine on him or that he was responsible for its payment. Wang's parents could not afford to pay the fine and thus decided to flee. At that time the family left their village and split up, Wang going to live with his grandmother in one village while the remaining members relocated to another. The family, however, subsequently reunited and returned to its home.

Wang's father obtained permission to pay the fine by 1996 on an installment basis. Nevertheless, the government repeatedly subjected the Wang family household to property destruction and harassment because the fine remained unpaid. Thus, from the time of his sister's birth in February 1988 until the date of Wang's administrative hearing in these proceedings on October 31, 2000, governmental authorities made between ten and sixteen visits seeking payment of the fine. Wang testified, "every time they show up they always keep on asking us why don't we pay up the remaining balance and they start destroying, smashing our chairs and furnitures [sic]." AR at 174-75.[2] Yet the authorities' intrusions into the family's life had their limitations as neither Wang nor his sister had any trouble attending school, and the authorities never arrested, detained or fined Wang. Accordingly, it is clear that the authorities did not direct their actions at Wang.

Wang's father left China in 1992 to earn enough money to pay the fine. For three years, he worked in Argentina and sent money back to China to support his family and to pay the fine incrementally. Nevertheless Chinese government officials continued to visit the house, causing destruction and continuing to harass the family while Wang's father worked in Argentina. While Wang's father was in

---

[2]AR refers to the administrative record.

3

Argentina he was kidnapped, in response to which Wang's mother borrowed $10,000 from a bank, using the family home as collateral, to pay a ransom. Wang's father returned to China in 1995 but was not arrested or detained on his return. After Wang's father's return, the government continued to harass the family.

In 1996 government authorities presented the family with another notice reflecting the 20,000 yuan fine. This notice did not credit the family with payments already made on the fine. In that same year government officials sterilized Wang's mother and "totally destroyed" the family home. Id. at 179. The family, however, was able to recover blankets from the home and subsequently relocated, first to Wang's grandmother's house and then to a one-room home. The Wangs' previous residence was comprised of two stories and several rooms.

Wang's father later unsuccessfully attempted to leave China a second time in search of work. The family began to rely on an uncle's generosity to survive, but the uncle could not provide the family with enough money to continue to pay the fine. Eventually Wang's parents opened a snack bar business, but government authorities destroyed the equipment of the business late in 1998 and "started laughing on the way out." Id. at 183, 185-86.

Subsequently, with the help of smugglers, Wang physically arrived in the United States on December 3, 1999, at JFK International Airport where he was detained. Upon his arrival Wang applied for admission to the United States, but the immigration service denied that application and instead instituted administrative removal proceedings against him. The notice to appear served on him charged that he was not in possession of valid entry documents and that it was likely he would become a public charge if admitted. Wang admitted that the entry document charge was valid, but in an effort to prevent removal he applied for asylum, withholding of removal, and protection under the Convention Against Torture.

Wang fears that if he returns to China, the Chinese authorities will arrest him because he left the country illegally and the arrest could lead to the imposition of another 20,000 yuan fine. Because Wang's family lacks the ability to pay this amount, Wang fears that he will remain in custody if he returns to China. Wang's family hopes that he will be able to live safely in the United States and earn enough money so that the family can pay its debts.

4

An immigration judge held a hearing on Wang's application following which the judge issued a written decision and order dated November 7, 2000, denying Wang's application for asylum but granting his application for withholding of removal. The government appealed the decision and order of the immigration judge to the BIA to the extent it granted Wang's request for withholding of removal and Wang cross-appealed to the extent it denied him asylum. The BIA sustained the government's appeal and ordered Wang removed to China on June 6, 2003.

Wang timely filed a petition for review of the BIA's decision with this court and simultaneously filed a motion with the BIA for reconsideration of its June 6, 2003 decision, arguing that it failed to address his cross-appeal. The BIA granted Wang's motion for reconsideration and vacated its June 6, 2003 decision on May 11, 2004.[3] However, in the same decision, the BIA sustained the government's appeal for a second time, dismissed Wang's cross-appeal, and ordered his removal.

Wang filed a timely petition for review of the BIA's May 11, 2004 decision on June 10, 2004, with this court. He then moved to withdraw his original petition for review and on July 26, 2004, we granted that motion. At that time we also stayed his removal pending the disposition of these proceedings.

## II. JURISDICTION AND STANDARD OF REVIEW

The BIA had jurisdiction in this matter under 8 C.F.R. § 1003.1(b)(3), and we have jurisdiction to review the final order of removal under section 242(a)(1) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1252(a)(1). See Chen v. Ashcroft, 376 F.3d 215, 221-22 (3d Cir. 2004).

Congress has directed us to treat the BIA's findings of fact as conclusive "unless any reasonable adjudicator would be compelled to conclude to the contrary." INA § 242(b)(4)(B); 8 U.S.C. § 1252(b)(4)(B); see INS v. Elias-Zacarias, 502 U.S. 478, 481, 112

---

[3]We observe that the government does not suggest that by filing his initial petition with this court Wang deprived the BIA of jurisdiction to entertain the motion for reconsideration.

S.Ct. 812, 815 (1992).  A determination of whether an asylum applicant has suffered from "persecution" or whether that individual has a "well-founded fear of persecution" is factual and thus is entitled to deference.  Abdille v. Ashcroft, 242 F.3d 477, 483-84 (3d Cir. 2001).

We review the BIA's attempts to fill gaps in the INA under the Supreme Court's direction requiring us to "respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program," but also under the direction that the courts decide pure questions of statutory construction.  INS v. Cardoza-Fonseca, 480 U.S. 421, 446-48, 107 S.Ct. 1207, 1221 (1987); see Fatin v. INS, 12 F.3d 1233, 1239 (3d Cir. 1993) (quoting the Court's statement in Chevron U.S.A., Inc., v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2782 (1984) that "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute"); Chang v. INS, 119 F.3d 1055, 1060 (3d Cir. 1997) (quoting the Supreme Court in Chevron, 467 U.S. at 844, 104 S.Ct. at 2782, to state that "we will not substitute our own judgment for that of the BIA, but we must also reject any interpretation by the BIA that is 'arbitrary, capricious, or manifestly contrary to the statute'").

## III.  DISCUSSION

### A.        Determination framework

Section 208(b) of the INA, 8 U.S.C. § 1158(b), provides the Attorney General with discretion to grant asylum to a "refugee," with certain exceptions.  In general, a "refugee" is "any person who is outside any country of such person's nationality . . . who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  INA § 101(a)(42)(A); 8 U.S.C. § 1101(a)(42)(A).  An applicant has the burden to establish that he fits within this definition of refugee.  8 C.F.R. § 1208.13(a).

An applicant may establish his refugee status by showing

6

either that he has been subject to past persecution or has a well-founded fear of future persecution. The persecution, however, must be "on account of" one of the five statutory bases. 8 C.F.R. § 1208.13(b). It is presumed that an applicant who establishes that he suffered past persecution has a well-founded fear of persecution. 8 C.F.R. § 1208.13(b)(1). The government may rebut this presumption, however, by showing by a preponderance of evidence that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality" or that "the applicant could avoid future persecution by relocating to another part of the applicant's country of nationality." 8 C.F.R. § 1208.13(b)(1)(i)(A)-(B).

Congress has provided that "a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program" is "deemed to have been persecuted on account of political opinion." INA § 101(a)(42)(B); 8 U.S.C. § 1101(a)(42)(B). Similarly, a person who has a well-founded fear that he will be subject to such procedures or will be subject to persecution for resisting such procedures is "deemed to have a well founded fear of persecution on account of political opinion." INA § 101(a)(42)(B); 8 U.S.C. § 1101(a)(42)(B).

While the decision to grant or deny an applicant asylum is discretionary even if he establishes that he meets the statutory eligibility requirements, the government must grant withholding of removal, with certain exceptions, to an applicant if he demonstrates a "clear probability" that, upon return to his home country, his "life or freedom would be threatened" on account of race, religion, nationality, membership in a particular social group, or political opinion. INA § 241(b)(3)(A); 8 U.S.C. § 1231(b)(3)(A); INS v. Stevic, 467 U.S. 407, 430, 104 S.Ct. 2489, 2501 (1984). In harmony with the asylum regulations, the regulations governing withholding of removal provide that an applicant bears the burden to establish eligibility for withholding of removal and if the applicant establishes that he suffered persecution in the past, "it shall be presumed that the applicant's life or freedom would be threatened in the future . . . ." 8 C.F.R. § 1208.16(b). As in cases involving applications for asylum, the government may rebut this presumption by showing that a change in circumstances has removed the basis for the applicant to have a well-founded fear of persecution or by showing that the threat is not country-wide. 8 C.F.R. §1208.16(b)(1).

7

Under the Convention Against Torture, an applicant is entitled to withholding of removal if he establishes that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). The regulation defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted" by a public official for certain purposes. 8 C.F.R. § 1208.18(a)(1).

### B. The Decisions of the Immigration Judge and the Board of Immigration Appeals

The immigration judge recognized two potential bases for Wang's application for asylum. The first basis was that he and his family had suffered past persecution resulting from his parents' violation of China's family planning policies. The second basis was that Wang is a member of a particular social group consisting of "poor and uneducated Chinese who are forced to pay a heavy fine far larger than they can afford" for violating the family planning policies. The heavy fine, the theory goes, forces members of this particular social group to turn to international smuggling operations to search for work in foreign lands and the Chinese government directly and indirectly supports those smuggling organizations. The immigration judge summarily dismissed the second basis due to a lack of evidence that "official Chinese government policy is either to encourage alien smuggling or to support such endeavors." AR at 136. Accordingly, the immigration judge focused on Wang's first basis, past persecution due to his parents' violation of the family planning laws. Wang does not pursue his second argument vigorously in these proceedings, which we note, in any event, insofar as the record here reveals, could not be substantial. Rather, he focuses on his first argument predicated on China's family planning policies.

The immigration judge found that the Chinese government's actions against Wang and his family amounted to persecution "where the respondent's mother was forcibly sterilized and where the family's home was completely destroyed when his parents were unable to pay the family planning fine." Id. The immigration judge acknowledged that Wang's parents were the government's primary targets, but stated that "[t]hese government-sanctioned actions against the respondent' [sic] parents effectively extended to the respondent, who found himself without a home." Id. at 136. While the immigration judge was "not prepared to rule that a child may legally take the place of a spouse for all purposes," the judge did conclude that "there is

8

sufficient evidence in this record to establish that this respondent was directly affected by the Chinese government's persecution of his parents and can legally stand in their shoes as one who has been persecuted." Id.

Nevertheless the immigration judge did not grant asylum to Wang because the judge concluded that "sufficient adverse factors" weighed against a discretionary grant of asylum. Id. at 137. Those factors included the circumstance that Wang was not fleeing direct persecution, had attended school, the past persecution was not based on physical harm, and he did not leave China to escape future physical harm. Primarily, however, the immigration judge relied on the fact that Wang's family had hired smugglers to transport him to the United States as the discretionary basis for denying his application for asylum. The immigration judge determined that "[b]y granting asylum to otherwise marginally asylum-eligible aliens, such as this young respondent, such results accomplish little more than to reward the smugglers and provide more incentive for other families to put their children into harm's way." Id. at 138.[4]

Even though the immigration judge's reasoning led the judge to deny a grant of asylum, the judge determined that Wang had met the burden of proof for a grant of withholding of removal because he had established a "clear probability" of persecution upon his return to China. Inasmuch as a grant of withholding of removal is not discretionary if the statutory requirements are met, the immigration judge ordered that Wang's removal be withheld. Wang also sought relief under the Convention Against Torture, but the immigration judge did not address this claim due to the grant of withholding of removal.

The government appealed and in a June 6, 2003 decision, the BIA sustained the government's appeal. The BIA concluded that Wang failed to establish either past persecution or a well-founded fear of future persecution based on any one of the five statutory grounds for granting asylum. Id. at 64. The BIA dismissed Wang's argument regarding his fear of imprisonment upon return to China predicated on

---

[4]The immigration judge indicated that "Wang testified that he was not aware of how much money his parents borrowed to pay the smugglers" but that "the court has adjudicated a great many Chinese asylum cases, including numerous Chinese juveniles, where the smuggling fees range anywhere for $30,000 to $40,000." AR at 137.

his action in leaving the country illegally because he did not prove that "the exit policy in China constitutes punishment for invidious reasons rather than being a law of general applicability." Id. at 65. The BIA found that the harm that Wang claimed from past persecution stemming from his parents' violation of the family planning policies was "too indirect to establish past persecution." Id. Because the Board found the connection to be too tenuous, it agreed with the government that Wang did not prove his eligibility for asylum protection. Without further discussion, the Board also determined Wang to be ineligible for protection under the Convention Against Torture and for withholding of removal.

Wang moved for reconsideration on the basis that the BIA failed to address his cross-appeal in its June 6, 2003 decision. The Board granted Wang's motion for reconsideration, vacated its June 6, 2003 decision and order, and entered a new decision and order dated May 11, 2004. Wang's petition for review addresses the May 11, 2004 decision and order.

In this second decision and order dated May 11, 2004, the BIA again concluded that Wang failed to establish either past persecution or a well-founded fear of future persecution on the basis of any of the five statutory grounds for asylum. The BIA stated that Wang could not stand in his parents' shoes and rely on the persecution they experienced to support his own asylum claim. According to the BIA, "[w]hile the respondent might be eligible as a derivative of a successful asylum application filed by either of his parents arising from their violation of the family planning policies, we do not find that the respondent can demonstrate persecution in his own right on account of the violation or resistence [sic] to family planning policies." AR Supp. at 6.[5] The BIA also repeated its earlier finding that Wang did not prove that China's exit control program "constitutes punishment for invidious reasons." Id. at 6.

In addition to its conclusion that Wang could not stand in the shoes of his parents for asylum purposes, the BIA concluded that "[o]n the record before us, we do not find that [Wang] has adequately established that the past harm he experienced rose to the level of persecution." Id. The BIA pointed out that Wang was not arrested, detained or fined, and that he had no trouble attending school. Rather,

---

[5] AR Supp. refers to the supplemental appendix Wang's attorneys submitted.

10

the BIA indicated that, "[p]erhaps the worst effect on him of the actions against his parents was the destruction of their home, but he testified the family was able to live in a different home that was not as good." Id. Finally, the BIA denied Wang's application for withholding of removal and relief under the Convention Against Torture as it concluded that the record did not establish that if Wang returned to China it is more likely than not that he would be subject to persecution on account of a statutory basis for granting asylum or would be tortured.

### C. Asylum Eligibility

The crux of an asylum determination is whether an applicant has established that he has suffered from past persecution or has a well-founded fear of future persecution on account of one of the five statutory bases: race; religion; nationality; membership in a particular social group; or political opinion. Here, Wang is seeking asylum based on past persecution on account of political opinion or on account of his membership in a particular social group. While he also contends that he qualifies for asylum by reason of his well-founded fear of persecution based on his violation of China's exit-control policy, the evidence in the record does not compel, or even permit, us to disturb the BIA's finding rejecting this contention. Thus, we do not address this point further.

According to Wang he was persecuted because the Chinese government: (1) imposed a fine grossly disproportionate to their income on his parents for violating the family planning policies; (2) engaged in a lengthy pattern of destruction of the Wang family's property, including total destruction of the family home; (3) destroyed equipment necessary to the family business; (4) left the family with no choice but to leave their home temporarily to run from the government; (5) caused family separation at several points in time; and (6) refused to acknowledge the payments the family made towards the family planning fine. We will assume without deciding that these acts amounted to persecution of Wang's parents.

Our assumption that the government authorities' behavior amounted to persecution of Wang's parents does not end our inquiry. To satisfy the statute, Wang must have suffered from the persecution and the persecution must have been "on account of" one of the five statutory bases for granting relief. The BIA believed that "the statutory ground on which the Immigration Judge found the

11

respondent to have been persecuted is not entirely clear." Id. at 5. The BIA explained that "it is not certain whether the Immigration Judge concluded that [Wang] was a victim of past persecution as a member of a particular social group or whether he concluded that [Wang] qualified for asylum and withholding under the laws designed to protect those who violate or resist the family planning as one 'standing in the shoes' of such person or persons." Id. But it then went on to explain that it did not find "the ultimate result in this case [would be] different on either reading of the Immigration Judge's decision." Id.

The BIA concluded that Wang could not stand in the shoes of his parents "where the persecution is claimed to have been experienced by his parents as the result of the family planning policies," and thus he could not show persecution on account of political opinion. Id. The BIA reached this conclusion by reasoning that the statutory definition of "refugee" on account of a violation of the family planning policies includes only "those who violate or resist the family planning policies (the respondent's parents in this particular case)," and not the child of such a person. Id. The BIA acknowledged that it has interpreted the statutory definition of refugee to include the spouse of such a person. See In re C-Y-Z, 21 I & N Dec. 915, 918 (BIA 1997). The BIA, however would not interpret the statute to include the child of a person deemed to have suffered persecution on account of political opinion.

It is obvious that the facts here are distinguishable from those in C-Y-Z. In C-Y-Z, the applicant sought asylum based on the involuntary insertion of an intrauterine device (IUD) into his wife and on the basis of his wife's eventual involuntary sterilization. As the BIA explained, the issue in C-Y-Z was "whether the applicant in this case can establish past political persecution based upon his wife's sterilization." Id. at 917 (emphasis added). The BIA answered this question affirmatively as it held that "the applicant in this case has established eligibility for asylum by virtue of his wife's forced sterilization." Id. at 918 (emphasis added).

A child, however, is not a spouse. It should be obvious to anyone that whereas a husband has a direct interest in whether his wife can have additional children, a child is in a very different position as the family planning policies as applied to his parents can affect him only as a potential sibling and not as a parent. In Chen v. Ashcroft, 381 F.3d 221, 225-27 (3d Cir. 2004), we discussed but did

12

not decide whether the BIA's interpretation in C-Y-Z was permissible and then went on to hold that the BIA's interpretation of INA § 101(a)(42)(B) not to reach unmarried partners was reasonable.[6] It seems to us that in view of Chen we are dealing with an a fortiori case insofar as this case implicates the principles in C-Y-Z. Surely if an unmarried parent cannot obtain relief under C-Y-Z then a potential sibling cannot either as his interest in the birth of a child to his parents is more remote than that of a parent, married or not. Thus, we go on to consider the balance of Wang's asylum claim.

While Wang could not prove persecution on account of political opinion, this failure would not mean that he could not establish that he was persecuted on account of some other statutory reason giving him a basis to seek relief. But in this regard we are satisfied that we cannot disturb the BIA's ultimate conclusion that Wang has not established adequately "that the past harm he experienced rose to the level of persecution." AR Supp. at 6. As the BIA pointed out, Wang "was not arrested, detained, or fined in China, and testified that neither he nor his sister had any trouble attending school." Id. Thus, the BIA observed that the worst effect on him of the actions against his parents was the destruction of their home, but "he testified the family was able to live in a different home that was not as good." Id.

In fact Wang's claim gets down to an assertion, accepted in these proceedings, that the economic harm to his family by reason of the government's persecution of his parents caused him to be separated from them for a period of time and later required him to live in a house inferior to that in which he lived prior to the persecution. In considering this harm, we are informed by our recent opinion in Li v. Attorney General, 400 F.3d 157 (3d Cir. 2005). After an extensive review of the cases, we held in Li that "the deliberate imposition of severe economic disadvantage which threatens a petitioner's life or freedom may constitute persecution." Id. at 168. As we have indicated we are assuming without deciding that as to Wang's parents the authorities' action did constitute persecution and thus meet the Li test. We also are assuming without deciding that in an appropriate

---

[6] In Chen v. Ashcroft, 376 F.3d at 223 n.2, we pointed out that C-Y-Z could be contributing to the destruction of family units and suggested that "it would be useful to study the actual impact of C-Y-Z on family structures." We do not know whether this study has been or will be done.

case persecution of parents can be persecution of a child even though the effect on the child is only a collateral consequence of his parents' persecution.[7]

Nevertheless for the child to be persecuted he must show that the persecution threatened his "life or freedom" and in this case Wang has not come close to meeting that standard. Indeed, even the immigration judge who granted Wang relief regarded this case as only marginal. Thus, we need not consider whether the Chinese authorities' treatment of Wang could be attributed to one of the five statutory bases for granting asylum because he was not persecuted on any basis. Moreover, inasmuch as we have no reason to disturb the BIA's finding that Wang was not eligible for asylum his contention that the BIA erred in upholding the immigration judge's exercise of discretion to deny asylum is moot.

We realize that our result has the disadvantage of being uncertain in its application as compared to a bright-line rule that persecution only of parents never can be regarded as persecution of a minor child who is a member of the parents' household or always should be so regarded. Thus, application of the principles here will require that immigration judges and the BIA decide cases on an individual basis. Yet as Judge Becker said in his concurring opinion in United States v. Balascsak, 873 F.2d 673, 684, 685 (3d Cir. 1989), "drawing lines depending on the facts is the stuff of judging." Moreover, in this case the BIA, in what we regard as an unassailable decision, actually drew lines. Furthermore, a determination of whether an adverse act rises to the level of persecution even with respect to the person against whom it is directed requires the drawing of lines. Thus, we are comfortable with our result.

D. Withholding of Removal and Convention Against Torture

---

[7]For example, a child might suffer from mental or physical disabilities that makes him particularly dependent on his parents so that persecution of them has a particularly pronounced impact on him. But there is no indication in the record that Wang is disadvantaged in this way and he does not claim in these proceedings to suffer from any disability making him especially vulnerable. Indeed, we draw quite the opposite inference as his parents were willing to send him to the United States unaccompanied by any family member when he was only 14 years old.

14

Inasmuch as Wang is not eligible for asylum, he cannot demonstrate eligibility for withholding of removal. See Janusiak v. INS, 947 F.2d 46, 47-48 (3d Cir. 1991). Thus, we need not discuss that potential basis for granting Wang relief separately though we do set forth our view that based on the record we see no reason to believe that if he returns to China his life or freedom will be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion or, indeed, as far as we are aware, for any reason. See INA § 241(b)(3)(A); 8 U.S.C. § 1231(b)(3)(A). Finally, we reject Wang's claims under the Convention Against Torture as we agree with the government that "[t]here is absolutely no evidence in the record to compel the conclusion that there is a clear probability that Wang will be tortured if returned to China." Respondent's br. at 31.

## IV. CONCLUSION

For the foregoing reasons we will deny the petition for review and will vacate our order of July 26, 2004, staying Wang's removal.

_____

15