DLD-220                                                           **NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1116
_____

SANBUR AGOLE SHIRE,
                                                    Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
                                                    Respondent

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A208-676-080)
Immigration Judge:  Honorable Roxanne C. Hladylowycz

_____

Submitted on Respondent's Motion to Remand the Matter
to the Board of Immigration Appeals, Petitioner's Motion to Stay Removal and
Petitioner's Motion for Appointment of Counsel
May 24, 2018
Before:  JORDAN, SHWARTZ and KRAUSE, <u>Circuit</u> <u>Judges</u>

(Opinion filed: May 31, 2018)
_____

OPINION[*]
_____

PER CURIAM

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Sanbur Agole Shire petitions for review of a decision by the Board of Immigration Appeals (BIA).  For the reasons below, we will grant the Government's motion to remand.

Shire, a citizen of Somalia, applied for admission to the United States in October 2015.  In December 2015, he was charged as removable as an immigrant who did not possess a valid entry document.  Proceeding pro se, Shire applied for asylum, withholding of removal, and relief under the Convention Against Torture (CAT).  He alleged that he had been persecuted as a member of the Yibir tribe and accused of practicing witchcraft.  An Immigration Judge (IJ) denied his applications, and Shire waived his right to appeal.  Shire then retained counsel.  He filed a motion to reconsider with the IJ, asserting that he did not knowingly waive his appeal to the BIA.  He also sought to reopen his proceedings because he had recently learned that his father was killed by a terrorist group, Al-Shabaab, who believed his father was practicing witchcraft.

Another IJ granted the motion to reconsider and reissued the first IJ's decision, which Shire then appealed.  The BIA remanded the matter for a written decision because the IJ had not issued "a separate oral or written decision setting out the reasons for the decision."  A.R. at 79.  After a written decision was issued by the first IJ, Shire appealed again.  He asked the BIA to consider the motion to reopen he had filed before the IJ.  The BIA dismissed the appeal and denied the motion to reopen.  Shire filed a pro se petition for review and a motion to stay removal.  He has also filed a motion for counsel.

The Government does not oppose the stay motion and has filed a motion to remand the matter to the BIA.  Disclaiming any error by the BIA, the Government states

2

that a remand will allow the BIA to reconsider whether the harm Shire suffered was on account of his tribal membership. The Government does not explain why the BIA's decision would be any different on remand. But for the reasons below, we agree that the BIA should reconsider its decision and will grant the motion to remand.

Asylum and Withholding of Removal

To establish eligibility for asylum, Shire needs to demonstrate either past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. See Wang v. Gonzales, 405 F.3d 134, 138-39 (3d Cir. 2005). To establish eligibility for withholding of removal, he needs to demonstrate that it is more likely than not that his life or freedom will be threatened in Somalia on account of a protected ground. Id. at 139; 8 U.S.C. § 1231(b)(3)(A).

Shire's testimony and affidavit

Shire testified that he had been persecuted in Somalia as a member of a minority tribe, the Yibir. He stated that members of the Yibir tribe are regarded by many as un-Islamic and practitioners of evil witchcraft. In an affidavit in support of his application for relief, Shire asserted that the members of his tribe are of Jewish descent from Ethiopia and are seen as an inferior and landless group of outsiders. A.R. at 407. He described a popular Somali myth that the Yibir tribe are wandering scavengers of human carcasses. Id. Shire stated that Somalis believe that the Yibir possess a "dangerous supernatural evil entity that can inflict a curse on locals." For this reason, the Yibir are exposed to extreme abuse more than other minority tribes. Id. He stated that members of his tribe are

3

prevented by custom from owning livestock or land and generally work low-paying jobs. Id. Thus, some Yibir are forced to practice magic to make a living. Id.

Shire's grandfather was a well-known spiritual leader who helped sick people. A.R. at 408. He was paid a traditional fee after ceremonies. Id. After the collapse of the Somali government in 1991, minority tribes were victims of persecution and harassment, and Shire's grandfather was killed by members of the local militia which controlled the area. Id. While growing up, Shire heard his father called "witch" and "dirty blood." A.R. at 409.

Shire fled Somalia after being accused of practicing witchcraft and being attacked by local militia men. Shire enjoyed watching movies for entertainment, and after watching them, would sell them from his barbershop in order to buy more movies. These movies were from Nigeria and about "Nigerian cultural life and how these individuals practiced witchcraft, magic, and the ways in which they used both." A.R. at 410. He and his brothers watched them during down time between customers. Id.

At his hearing, Shire testified that in February 2015, six men from a tribal militia, Reer Hassan, kidnapped him and took him to a house. A young girl was there who appeared to Shire to be mentally ill. Her father was the leader of the Reer Hassan tribe. The militia men had found some movies that Shire had sold. They believed that the movies had "witched" the girl and accused him of "creating an evil substance" on the girl and causing her mental illness. The men accused Shire and his family of causing the sickness because they are Yibir and possess supernatural powers that harm people and make them sick. Shire testified that the men, like most Somalis, believe that members of

4

the Yibir tribe can create evil and mental illness. The militia men believed that Shire could cure the girl and threatened him if she did not get better within seven days. A.R. at 151-56, 410.

A week later, the men came to Shire's barbershop asking for the cure. They beat him and stabbed him in his eye, causing some vision loss. They threatened to return in seven days and damage his other eye if the girl was not cured. After going to a hospital for treatment, Shire then hid at a friend's house for a month. Meanwhile, the militia spread rumors that Shire's family could create "sickness and ill mind" which turned the neighborhood against them. A.R. at 156-61. In his affidavit, Shire stated that people would shout obscenities at his family, call them witches, and refuse to sell them food. A.R. at 412.

A month later, Shire stopped by his barbershop to pick up some money. Three militia men grabbed him and shouted that they had caught "the evil hand." A crowd gathered and threw stones at Shire. The militia men beat him badly and shot him in the leg. They let him go when he stated he had the cure for the girl and would go get it. Hospital workers refused to treat him for his injuries because they were afraid of the militia. After treatment by a pharmacist who came to his home, Shire went back into hiding. A few months later, he left Somalia. A.R. at 161-68.

During his travels to the United States, Shire called his family to discover that they had fled their hometown after being attacked by the militia. The militia raped his sisters, tortured his father, and killed his brother. Shire stated this happened because his family were all considered guilty of making the young girl sick. The militia threatened to kill

5

his family one by one until the sick girl was cured. His family fled to a camp for internally displaced persons (IDP). A.R. at 174-77, 415. As noted earlier, Shire's father was later killed by Al-Shabaab after being accused of practicing witchcraft.

The IJ dismissed Shire's assertion that the mistreatment he endured was on account of his race or tribal membership because Shire had never before been accused of witchcraft. Rather, she concluded that Shire was viewed as a practitioner of magic because he traded in movies.[1] Assuming arguendo that Shire testified credibly, see A.R. at 4, the BIA upheld the IJ's determination that the militia did not attack Shire on account of his tribal affiliation but rather because of its opposition to the movies he sold out of his barbershop:

> However, where, as here, the respondent did not identify any persuasive evidence suggesting that the tribal militia was motivated by his tribal identity, rather than his distribution of movies, and in light of the limited background evidence only suggesting a historical link between the tribe and the practice of witchcraft, we cannot discern clear error in the Immigration Judge's motive finding.

A.R. at 4-5.[2] The BIA did not reach the issue of whether the harm Shire suffered—being stabbed in the eye, badly beaten, and shot in the leg—amounted to past persecution or whether Shire had a well-founded fear of future persecution, in light of the harm that

---

[1] At his hearing before the IJ, she explained her reasons for denying Shire's application off the record. Shire stated in an affidavit that the IJ told him that she was denying his case because he did not move to another part of Somalia before coming to the United States. The question of whether an alien can relocate internally to avoid persecution is usually reached only after the alien has been determined to have suffered past persecution. 8 C.F.R. § 1208.13(b)(1)(i)(B) (asylum); 8 C.F.R. § 1208.16(b)(1)(i)(B) (withholding of removal). When the matter was remanded to the IJ for a written decision, she did not mention internal relocation.

[2] The IJ made an adverse credibility finding but also addressed Shire's claims on the merits. Because the BIA did not rely on it, we will not discuss the weaknesses in the adverse credibility finding.

befell his family after he escaped: rape, torture, and murder.

Background Material

The background material in the record paints a bleak picture for those who belong to a minority tribe in Somalia. The United States Department of State Country Report on Human Rights Practices in Somalia for 2014 included the Yibir in a list of minority clans and noted that "[m]inority groups, often lacking armed militias, continued to be disproportionately subjected to killings, torture, rape, kidnapping for ransom, and looting of land and property with impunity by faction militias and majority clan members. Many minority communities continued to live in deep poverty and to suffer from numerous forms of discrimination and exclusion." A.R. at 576.

Citing the IJ's opinion, the BIA determined there was only a historical link between Shire's tribe and the perceived practice of witchcraft. The IJ had concluded that there were some vague references in the record that the Yibir were associated with mysticism before Somalia's independence in 1960. However, there is evidence in the record—in addition to Shire's testimony which was presumed credible—that this link still exists today. For example, Shire cited to a recent country report on Somalia written by the European Union's European Asylum Support Office:

> The Yibir are a small group said to have a Jewish background, despite practicing Islam and having no knowledge about Jewish traditions. Supernatural powers are attributed to them, and they live mainly in central and northern Somalia and in some urban places in Southern Somalia. Traditionally, they are ritual specialists.

A.R. at 419; (Full report available at

https://coi.easo.europa.eu/administration/easo/PLib/EASO-COIreport-Somalia_EN.pdf

(last visited May 16, 2018)).  Shire also quoted from a report by the Austrian Centre for

Country of Origin & Asylum Research and Documentation:

> Members of Yibr used to have mythological functions in society (and do not involve themselves in other tasks in traditional Somali society):  They collected the Samanyo (a birth gift) from new-born babies and newly-married girls in exchange for giving them a good fortune.  Historically, the Yibr enjoyed some protection before independence through this superstitious practice that prevailed about them, and which is now no longer widely practiced. After independence they suffered from the banning of the Samanyo custom and other related traditions by the government. With the presence of radical Islamic groups like Al-Shabaab with strong anti-Jewish attitudes, the Yibr who claim historical descent from the Hebrews have been increasingly suspected by Somalis with a radical Islamic orientation. Therefore members of the Yibr may be targeted in South Central Somalia, despite the fact that they are Muslims today.

A.R. at 420; (Full report available at http://www.refworld.org/docid/4b29f5e82.html (last

visited May 16, 2018).  The author of a 2015 article describing the plight of minority

women in Somalia noted that the Yibir clan "to this day hold a low status in relation to

the main Somali population.  Despite this, they are believed by many to have special

powers and are sometimes asked to bless the birth of a newborn baby."  A.R. at 487.

While not as recent, two other reports indicate that the supernatural reputation of

the Yibir lasted beyond Somalia's independence in 1960.  In a 1991 report on minority

tribes, the Immigration and Refugee Board of Canada stated that the Yibir are feared for

their perceived sorcery abilities.  The Yibir are given gifts when a child is born because

the parents fear that if they do not appease them, the Yibir may cast a spell on the child.

A.R. at 523.  In a New York Times article from 2000, the author noted that the Yibir

were forbidden to be educated.  A.R. at 526.  "Traditionally many earned money through

the Somali belief, stretching back perhaps centuries, that it is lucky to give the Yibir a small amount of money when a son is born or at a marriage." A.R. at 526-27.

Another article lends support to Shire's testimony that the militia men believed that he could cure the mentally ill girl. In the article, published in 2013 by the Genetic Literacy Project, the author discussed the role of members of the Yibir tribe as providers of medicine.

> Historically, the Yibir have practiced a diversity of peddling trades such as folk medicine, spirituality and magic. Although considered a low caste, and in light of the scarcity of modern medical services in contemporary Somalia, Yibir healers and medicine-men provided the clan communities with indispensable folk medical services. As part of their traditional professional practices, they made and sold varieties of herbal medicines, performed traditional surgery involving circumcision, and specialized in the treatment of bone fractures. Midwifery is a popular Yibir specialization.
>
> By tradition, Somalis believe that the Yibir possess dangerous supernatural powers. Taking advantage of this belief, Yibir spiritualists performed a variety of protection rituals for pay. Although they used Quranic scriptures in their rituals, research has indicated that the rituals encompass a range of seemingly pre-Islamic pagan traditions.
>
> An old cultural tradition entitles Somalis to pay a fee to the Yibir, called samanyo, as retribution for the death of one of the Yibir's historic leaders. If the fee is not paid, Somalis believed that the Yibir would curse them.

A.R. at 529.

Thus, there is evidence in the record that a link still exists between members of the Yibir tribe and perceived supernatural powers. There is also evidence that Shire's family was believed to be associated with witchcraft. As noted above, Shire's grandfather allegedly was a well-known spiritual leader who helped sick people. While growing up, Shire heard his father called "witch" and "dirty blood." Shire also pointed to an article

9

regarding a man who was executed by Al-Shabaab after being accused of witchcraft. A.R. at 421. While the man's tribal membership is not noted, this is evidence that some Somalis still believe that witchcraft is practiced, and such an accusation can result in death.

We agree with the Government that a remand is needed for the BIA to reconsider whether the evidence establishes a nexus between the harm Shire endured and his tribal membership.

CAT relief

To be eligible for withholding of removal under the CAT, Shire needs to demonstrate that it is more likely than not that he would be tortured if removed to Somalia. 8 C.F.R. § 1208.16(c)(2). The BIA concluded that Shire did not meaningfully challenge the IJ's determination that Shire had not shown that any torture would occur with governmental acquiescence. It also stated that in light of the evidence showing that the government has taken steps to stop Al-Shabaab and in the absence of evidence that the government would not stop the tribal militias, it would uphold the IJ's denial of Shire's CAT claim.

However, there is evidence in the record that the government might not stop the tribal militias. In an affidavit in support of his application for relief, Shire stated that he had been tortured by the "clan militia, who are allies of the Government and are in effective control of Luuq [his hometown]." A.R. at 406. When asked by the Government at his hearing if the militia men were part of the army, Shire responded that "[t]hey are not part of the government or the African union forces, but they are

10

representing the government in controlling the area that we live." A.R. at 185. Thus, he averred that he had no other authorities to go to for protection. A.R. at 411. The United States Department of State Country Report on Human Rights Practices in Somalia for 2016 noted that:

> Impunity generally remained the norm. Governmental authorities took minimal steps to prosecute and punish officials who committed violations, particularly military and police officials accused of committing rape, killings, clan warfare, and extortion of civilians.
>
> Clan militias and al-Shabaab continued to commit grave abuses throughout the country, including extrajudicial and politically motivated killings; disappearances; cruel and unusual punishment; rape; and attacks on employees of nongovernmental organizations (NGOs), the United Nations, and diplomatic missions.

A.R. at 224. The Country Report also noted that "[g]overnment security forces *and allied militias*, other persons wearing uniforms, regional security forces, al-Shabaab, and unknown assailants committed arbitrary or unlawful killings." Id. (emphasis added)

While the Government seeks a remand for the BIA to reconsider Shire's asylum and withholding claims, given the evidence of ties between Somali government forces and the militia, the BIA may also wish to reconsider its decision on Shire's CAT claim.

### Motion to Reopen

The BIA treated Shire's motion to reopen as a motion to remand. A motion to remand is the functional equivalent of a motion to reopen. Korytnyuk v. Ashcroft, 396 F.3d 272, 282 (3d Cir. 2005). A motion to reopen must establish prima facie eligibility for asylum or other relief. Sevoian v. Ashcroft, 290 F.3d 166, 173 n.5 (3d Cir. 2002). In order to make a prima facie case, the applicant must produce evidence demonstrating a

11

"reasonable likelihood" that he is entitled to relief. Guo v. Ashcroft, 386 F.3d 556, 563 (3d Cir. 2004). Under 8 C.F.R. § 1003.2(c), the BIA may not grant a motion to reopen unless the evidence offered is material and was previously unavailable.

Shire alleged in the motion to reopen that his father had been killed by Al-Shabaab based on accusations of witchcraft. The BIA determined that Shire had not provided enough evidence to link the killing to the allegations. It is not clear what evidence the BIA expected a detained pro se litigant to obtain from his family in a refugee camp in the chaos of Somalia, to the extent that they are even still there. The evidence is new and strengthens Shire's application for relief. The BIA may wish to reconsider its decision with respect to Shire's motion to reopen.

For the above reasons, we will grant the Government's motion to remand. Shire's motion for the appointment of counsel for the petition for review is denied as moot. As Shire is not subject to removal while his appeal before the BIA remains pending, see 8 C.F.R. § 1003.6(a), we will deny the motion to stay removal as moot. If Shire desires review of any final order of removal entered on remand, then he must file a petition for review within thirty (30) days of the order. The temporary stay of removal granted by the Clerk of this Court on January 18, 2018, is lifted.